RHODES *v.* CARTER.

Opinion delivered March 17, 1930.

*W. A. Leach,* for appellants.

*M. F. Elms* and *Joe Morrison,* for appellee.

BUTLER, J. The statement of the case prepared by the attorney for the appellant H. H. John is a fair statement of the various contentions of the parties, and of the essential parts of the decree rendered, which statement we adopt as follows:

This action was brought by the appellant H. E. Rhodes against Chickasaw Animal Food Company, M. O.

Carter, H. H. John, G. A. Meyer, H. D. Dilday, Clarence Weiman and Joe Rosencrantz, as partners, formerly trading as Rimol Food Company, to recover rent alleged to be due upon a building owned by the appellant Rhodes. The gist of the complaint is that the parties named as defendants were operating in the appellant's building a business as partners under the firm name of Rimol Feed Company, and that they were indebted to him in a certain sum for past due rent.

It appears that M. O. Carter and R. F. Tate were partners doing business under the firm name of Chickasaw Animal Food Company in the city of Memphis, in the State of Tennessee. They were the owners of the right to install and cause to be operated in Arkansas, certain machinery to be used in the manufacture of feed from rice straw, and other like materials. The particular purpose of this machinery was to bale the straw, and inject into the bales molasses or other like substance.

If the process proved successful, the rice straw then of no value could be used to advantage and profit, and a large and profitable business built up. Tate and Carter were especially interested in getting the machinery installed and the business going, on account of the large royalties that would come to them from the business.

They first took the matter up with the Rice Growers' Association, and were by it referred to H. H. John, with whom they immediately began negotiations. A subscription agreement was prepared, and was signed by thirty rice growers who agreed conditionally to take stock in a corporation to be formed. H. D. Dilday was named as agent or trustee to collect the stock subscriptions, and H. D. Dilday, G. A. Meyers, H. R. Weiman, J. L. Rosencrantz and H. H. John were named as a committee to negotiate with Tate and Carter for the machinery.

A contract was entered into with reference to the machinery, in which was set forth the terms and conditions under which the machinery and business was to be operated. This contract was signed by H. H. John, one.

of the committee, and contained a provision that the corporation when formed would take it over, and that all rights and obligations under the contract would pass to the corporation when formed.

The subscription agreement was conditioned upon the happening of two events, viz.: 1. That stock in the proposed corporation at least to the amount of $5,000 be subscribed. 2. That satisfactory arrangements be made with Tate and Carter for the necessary machinery.

Tate and Carter refused to guarantee the successful operation of the machinery, so an agreement was entered into whereby the machinery was to be tested, the sum of $2,000 to be put up for that purpose.

Tate and Carter contend that Dilday and his associates had agreed to form a corporation, and had agreed to take stock in the corporation to be formed, and that they (Tate and Carter) as an evidence of their faith in the machinery, agreed to take stock in this corporation to the amount of $1,000, and that they paid the full amount of their subscription; that Dilday and his associates paid only a part of their stock subscription; that the amount unpaid was more than sufficient to pay the rent alleged to be due, and that Dilday and his associates should be required to pay in the unpaid subscription. They filed a cross-complaint against all persons who signed the subscription, and asked that all such persons be required to pay what they alleged to be the unpaid balance subscribed.

Dilday and his associates contended that they were not liable under the subscription agreement, for the reason that the contingencies upon which liability was to attach had not happened. They contend that, upon the refusal of Tate and Carter to warrant the machinery, another agreement was entered into whereby the machinery was to be tested, and the possibilities of the proposed project ascertained. Tate and Carter agreed to match dollars with Dilday and his associates in paying the expenses incident to the test. It being estimated that

$2,000 would be sufficient for the test, Tate and Carter paid in $1,000, and Dilday and his associates paid in a like amount. It was understood that, if the project was successful, the corporation would then be formed; that Dilday and his associates would receive stock in the corporation of the par value of the amounts paid in, and that Tate and Carter at the option of Dilday and his associates could have stock or their money refunded. Dilday and his associates used the subscription agreement as a basis for collecting the $1,000 required to make the test, and they paid in a total of $1,435, making a total of $2,435 paid in to defray the expenses of the test. The test operations were carried on under the name of Rimol Feed Company.

Dilday and his associates further contend that the lease contract aforesaid and the subscription agreement were not to become effective until the test had been made showing successful operation of the machinery and the business, and that the agreement for the test, in so far as operations for the test were concerned, was a subsequent agreement, and that such operations and contributions of money were not under the subscription agreement nor the lease contract. The project failed, and, when operations ceased, the total outstanding indebtedness, including the rent, was $915.89.

Dilday and his associates contend that by reason of this agreement a partnership relationship existed in which Tate and Carter were interested to the extent of one-half, and Dilday and his associates one-half; that for each dollar put up by them Tate and Carter were to put up a like amount, and that for any debts contracted Tate and Carter were liable for one-half and they the other. They further contended that, since they had paid in $435 more than Tate and Carter, Tate and Carter should be required to first pay in a like amount to be applied in payment of the debts which would leave a balance of $480.89, one-half of which or $240.45, should be decreed against Tate and Carter, and the balance against them.

Dilday and his associates further contended that the contributions on their part had been unequal, some paying a certain amount and some another; that it required $365 to make these contributions equal, and that the parties who should have paid this in should be required to do so. Dilday and his associates conceded the right of appellant Rhodes to recover jointly and severally of and from them and from Tate and Carter.

It was decreed that the plaintiff H. E. Rhodes, have judgment against all defendants and cross-defendants, as follows:

1. All persons who signed the subscription agreement who have not so paid shall first be required to pay in sixty per cent. of the sum set forth in the subscription agreement, as being subscribed by each of them.

2. All persons who signed the subscription agreement shall pay in 100 per cent. of the sum set forth in the subscription agreement as being subscribed by each of them.

3. In the event the amount thus paid in should not be sufficient, then all parties including Tate and Carter shall pay the balance, ratably according to the amount subscribed.

"It is to reverse this judgment that the plaintiff, Rhodes, and the defendants, Dilday and his associates, have appealed."

The trial court found that the Rimol Feed Company was a partnership composed of H. H. John, and the other stock subscribers including Carter and Tate, and, as such, "liable for the debts of said concern in proportion to the amounts each had subscribed or agreed to pay into the capital stock of said concern," and that Tate and Carter subscribed of said capital stock the sum of $1,000, and had paid this amount in full.

Carter and Tate contended that there never existed a partnership relation with respect to them and the others, and that such was never the intention, but, as they have not appealed from the finding of the trial court hold-

ing them liable as partners, it is unnecessary to discuss the sufficiency of the evidence in this particular. As to the others, that relation is admitted. Since the decree is equivalent to a finding that a partnership resulted from the acts of the parties and inferentially against the contention of the appellant John and others that the liability of Tate and Carter was not by reason of any agreement on their part to become partners, but, because of their subscription to the capital stock of the proposed corporation, John and his associates are concluded by the finding, as, in our opinion, the preponderance of the evidence does not show any express understanding between Carter and Tate on the one hand, and John and the remaining defendants on the other, that a partnership was created for testing the machinery, and that Carter and Tate should bear one-half -of the expense of such test, and therefore this finding of the lower court must stand. While it was in the mind of John and the others to form a corporation for the manufacture of food products, using the machinery to be acquired from Carter and Tate, and a partial subscription to the capital stock was made, the prospective incorporators had not proceeded to that point where, under our decisions, a corporation *de facto* would exist, and in the conduct of the test preliminary to the incorporation the relation assumed by the parties, according to the rule laid down in *Rainwater* v. *Childress*, 121 Ark. 541, 182 S. W. 280, was that of partners. In that case it is said: ''The effect of our decisions in *Whipple* v. *Tuxworth*, 81 Ark. 391, 99 S. W. 86, and *Bank of Midland* v. *Harris*, 114 Ark. 344, 170 S. W. 67, Ann. Cas. 1916B, 1255, is to hold that a strict or substantial compliance with the laws regulating the organization of corporations is necessary to constitute a corporation *de jure*. To constitute a corporation *de facto*, there need not be a strict or substantial compliance with the statute, but there must be a colorable compliance with the statute; that is to say, there must be color of a legal organization under the statutes, and user of the supposed

corporate franchise in good faith. Courts differ among themselves as to how much must be done in order to constitute a corporation *de facto*. But all of the courts agree, that some of the statutory steps must be taken in an honest attempt to comply with the requirements of the law, and exercise by the associates of the corporate powers. (Citing cases)."

It is unnecessary to determine whether the parties defendant in this case were partners within the rule laid down in *Doyle-Kidd Dry Goods Co.* v. *A. W. Kennedy & Co.*, 154 Ark. 573, 243 S. W. 66, and the cases therein cited, because, as we have seen, Carter and Tate have not appealed, and the testimony of John, which was not disputed by any of the other signers of the subscription list, was that he acted for himself and the other proposed incorporators in making the rental contract with the appellant Rhodes.

In *Doyle-Kidd D. G. Co.* v. *Kennedy & Co., supra,* the court referring to the case of *Rainwater* v. *Childress,* said: "That case is certainly authority for the doctrine, that where parties associate, intending to form a corporation, and join hands and capital in the conduct of the business under a name assumed by them, but without attempting to incorporate, they are liable as partners to third parties for the debts incurred."

We do not desire to be understood as in any sense extending the doctrine announced in *Rainwater* v. *Childress,* as construed by this court in *Doyle-Kidd D. G. Co.* v. *Kennedy & Co., supra,* for, as we have seen, an application of that doctrine is unnecessary for the determination of the liability of the defendants in this case. The court, in directing that the defendants should share liability in proportion to the amount of their subscription to the capital stock of the proposed corporation, doubtless treated the subscription list as an agreement by the subscribers between themselves as to their respective rights and liabilities, and since, as we shall presently show, plaintiff was entitled to collect his rent from all

or any one of them, the subscribers are in no position to complain as to the finding of the chancellor, which seems to be most just and equitable.

However, the plaintiff Rhodes could not be bound by any agreement between the defendants as to their respective rights and liabilities, when it is not shown that he assented to any such limitations. The evidence discloses that he merely rented a building to John as agent for the defendants in which to install and operate the machinery during the test to be made. Therefore, as to Rhodes, by their voluntary acts they were liable jointly and severally as partners in their relation to him. This rule is so well settled that the citation of authority is unnecessary.

It appears, on the whole case, that the chancellor in determining the rights and liabilities of the conflicting interests has worked out a method which, to our minds, does substantial justice, protecting the rights of part of the litigants without undue hurt to any one, but, as the plaintiff Rhodes must not be deferred in the collection of his debt to an accounting between the various defendants, the cause must be reversed, with directions to the trial court to render a judgment in favor of the plaintiff Rhodes for the debt due him against each and all of the defendants, jointly and severally, without limitation as to the time or manner in which the judgment shall be enforced, and as to any of the defendants paying the judgment in whole or in part, that they have contribution from their co-defendants in the manner and to the extent heretofore decreed by the trial court.

HUMPHREYS and KIRBY, JJ., dissent.