KING FEATURES SYNDICATE, department of the HEARST CORPORATION INTERNATIONAL NEWS SERVICE. DIVISION, appellant, v. JOHN F. COURRIER et al., dba HAWKEYE BROADCASTING COMPANY, appellees.

No. 47681.

(Reported in 43 N.W.2d 718)

872

AUGUST 1, 1950.

Johnson, Martin, Johnson & Phelan, of Fort Madison, for appellant.

Napier & Fehseke, of Fort Madison, for appellees.

MULRONEY, J.—This is a suit for specific performance of a written contract whereby it is alleged plaintiff agreed to furnish leased wire news reports to defendants for broadcasting in Fort Madison. The petition set forth a copy of the contract sued upon and prayed in the alternative for judgment against defendants for damages in the sum of $1918.80 for breach of said contract. The trial court dismissed plaintiff's petition.

The plaintiff, King Features Syndicate, is a department of the Hearst corporation and is engaged in the business of gathering news and furnishing news reports over leased wires to newspapers and radio broadcasting stations throughout the country. In the latter part of 1946, or the early part of 1947, John F. Courrier contacted plaintiff's agent, John Moran, in Chicago, relative to obtaining news report service on behalf of a proposed corporation. Mr. Courrier told Mr. Moran that he and defendant Barron proposed to form a corporation under the name of the Mississippi Valley Broadcasting Corporation to operate a broadcasting station in Fort Madison, Iowa. On February 24, 1947, the contract in suit was executed.

The contract states in its opening paragraph that it is between the King Features Syndicate and the "Mississippi

Valley Broadcasting Corporation, the owner of the Radio Station hereinafter named, hereinafter called the Broadcaster." The contract goes on to provide that the King Features Syndicate would furnish printer-telegraph machines to be installed in the broadcaster's place and the broadcaster was to pay $70 a week ($10 less if another client was obtained within a radius of fifty miles) for the daily news reports. The contract provided, "This agreement shall continue for five years from date starts broadcasting" and it was signed, on behalf of the broadcaster— "Mississippi Valley Broadcasting Corp. by John F. Courrier, Manager."

There is some dispute in the record as to whether Barron and Ashby were present when Courrier signed his name to the contract, and as to whether Ashby was associated with the other two when the contract was signed. We will consider the disputed testimony later. No corporation was ever organized but sometime later Courrier, Barron and Ashby went into partnership under the name of the Hawkeye Broadcasting Company and in February of 1948 the partnership commenced operating a broadcasting station in Fort Madison. Mr. Courrier notified Moran of the partnership and he said he would have the partnership sign a new contract and Mr. Courrier said that would be all right. No new contract was ever signed.

I. Returning now to the pleadings we find this is a suit against the defendants, individually, and the partnership, of which they are members, to compel specific performance of the above contract, or, in the alternative, for damages for the breach of the contract. The answer raised no issue as to the equitable jurisdiction to grant specific performance, though we venture to state one would search long among the authorities without finding any decision where a court has entertained a suit for specific performance of any similar contract for services.

The matter was not discussed in the briefs of either counsel and we have not been able, on independent examination, to discover any case where courts have granted specific performance of such service contracts. Of course, there are exceptional cases involving service contracts where proper fact situations were presented for equitable relief where the services have a unique and peculiar value. 58 C.J., Specific Performance, section 300;

49 Am. Jur., Specific Performance, section 134. Ordinarily the subject matter of a service contract where the performance of such services would be continuous over a long period of time is not one over which the equity court has power to decree performance. It comes under no recognized head of equity jurisdiction. The first obstacle to the granting of specific performance of service contracts is that the decree is likely to be futile. Then too there is the impossibility of the court's supervising continuous operations incident to such contracts and, of course, the adequacy of the legal remedy; also, as stated in 49 Am. Jur., Specific Performance, section 135, "it would be inexpedient, from the standpoint of public policy, to attempt to enforce such a contract specifically."

Plaintiff's presence in the equity court is based upon the application for equitable relief, namely, specific performance. It would seem defendants' failure of objections, otherwise fatal to plaintiff's capacity to invoke equitable jurisdiction, would not remove the obstacles to the granting of that relief. Our further consideration of this case is not to be construed as holding that the subject matter of this suit is one within the province of the equity court. But the failure to move to transfer to law constitutes a waiver of objections which might be urged against any other relief, to wit, damages, which the equity court is empowered to grant. Section 611.7, Code, 1950; Vosges v. Clark, 240 Iowa 1108, 38 N.W.2d 611, and cases there cited.

II. Plaintiff's theory of the liability of defendants on the contract is that Courrier, Barron and Ashby were promoters of a proposed corporation, and, as such, liable under this contract executed by one of them for the rest.

In The Telegraph v. Loetscher, 127 Iowa 383, 386, 101 N.W. 773, 774, 4 Ann. Cas. 667, we defined a promoter as "one who brings about the incorporation and organization of a company." There too we set forth the much quoted observation from 2 Cook on Stockholders, section 651, that the term promoter is a business and not a legal term " 'usually summing up in a single word a number of business operations, familiar to the commercial world, by which a company is generally brought into existence.' " See also Hinkley v. Sac Oil & Pipe Line Co., 132 Iowa 396, 107 N.W. 629, 119 Am. St. Rep. 564.

■ It is settled by the authorities that a promoter, though he may assume to act on behalf of the projected corporation and not for himself, will be personally liable on his contract unless the other party agreed to look to some other person or fund for payment. An apt statement of the rule is contained in 18 C. J. S., Corporations, section 132, page 532:

"Promoters of a corporation are personally liable on contracts which they have entered into personally, even though they have contracted for the benefit of the projected corporation, and although the corporation has been formed and has received the benefit of the contract; and they are not discharged from liability by the subsequent adoption of the contract by the corporation when formed, unless there is a novation or other agreement to such effect; and where they have thus entered into a contract personally they are liable for services rendered under the same after the formation of a corporation, in the absence of a novation or other agreement to the contrary."

In Shell Oil Co. v. Hanchett, 18 Cal. App. 240, 243, 63 P.2d 338, 339, the court said:

"The rule seems to be well settled that a promoter, though he may assume to act on behalf of a projected corporation and not for himself, cannot be treated as an agent of the corporation, for it is not yet in existence; and he would be personally liable on his contract unless there was an agreement to look to the new company, when formed, for payment."

In Schwedtman v. Burns, Tex. Civ. App., 11 S.W.2d 348, 349, the rule is stated:

"While it is true that promoters are personally liable on contracts which they have entered into personally, even though they have contracted for the benefit of a proposed corporation, unless there is a novation or other agreement whereby the party contracted with accepts the liability of the corporation, yet they are not personally liable on contracts made in the name and solely on the credit of the future corporation, and not on an express or implied representation that there is an existing corporation, where such intention is known to the other con-

tracting party, unless they are contracts which the corporation when formed has no power to adopt."

In Wells v. J. A. Fay & Egan Co., 143 Ga. 732, 733, 85 S.E. 873, 874, the court stated:

"Persons acting in concert to bring about the formation of a corporation are responsible for their acts. Where they buy machinery, receive it into their possession, and authorize one of their number to give a note for the purchase price, they cannot escape liability on the theory that they contemplated the organization of a corporation for which they intended the machinery. If one contracts as agent, when in fact he has no principal, he will be personally liable. A promoter, though he may assume to act on behalf of the projected corporation and not for himself, cannot be treated as an agent of the corporation, for it is not yet in existence; and he will be personally liable on his contract, unless the other party agreed to look to some other person or fund for payment. Clark on Contracts, §47."

See also 13 Am. Jur., Corporations, section 113, and Restatement of the Law, Agency, section 326.

The liability is the same if the promoters act in a promotional capacity, such as procuring stock subscriptions, or if they be merely prospective incorporators. 18 C. J. S., Corporations, section 132; Hersey v. Tully, 8 Colo. App. 110, 44 P. 854; Wunsch v. Noel, La. App., 177 So. 92, 93.

In 18 C. J. S., Corporations, section 132, page 533, the rule is stated:

"So, if they [promoters] assume to make contracts in the name of the proposed corporation and then voluntarily abandon their purpose of forming it, they become personally liable to make good those contracts, and each becomes liable to make good such as he has directly or indirectly authorized or ratified."

And in Wunsch v. Noel, supra, the court stated:

"The rule is well-established and generally recognized that when persons associate themselves together for the purpose of organizing a corporation, but pursue their purpose no further, or, if pursuing such purpose to the extent of signing valid

articles of incorporation, do not thereafter comply with conditions precedent to the company's doing business within the state, or, for any other reason, the proposed corporation never ripens into legal corporate existence, that the promoters or prospective incorporators, whether promoters in strict legal sense or not, are responsible as partners for all preliminary contracts and expenses incurred in connection with the project. Thompson on Corporations (3d Ed.) vol. 1, §§ 98, 99; American Nat. Bank of Shreveport v. Reclamation Oil Producing Ass'n of Louisiana, 156 La. 652, 659, 101 So. 10; Campbell v. J. I. Campbell Co., 117 La. 402, 41 So. 696; Provident Bank & Trust Co. v. Saxon, 116 La. 408, 40 So. 778; Lind v. Senton et al., 10 La. App. 633, 120 So. 535."

Applying the law set forth in the foregoing authorities to the facts in this case we find the individual defendants were promoters. They were "prospective incorporators" within the language of the Wunsch case above. All of the evidence points to a joint enterprise on the part of the individual defendants. The contract was well within the scope of the adventure. The representation that their association was soon to merge into a corporate entity was honestly made but their subsequent decision to substitute a partnership for the proposed corporation would not end their liability. As pointed out, the authorities generally are to the effect that their individual liability would not have ended if they had formed the corporation. Why then should it be said their individual liability ceased when they abandoned the plan to incorporate? We hold the individual defendants jointly and severally liable under the contract.

As to the liability of the partnership itself we hold the rule applicable would be the same as if the individual defendants did incorporate. As pointed out, the corporation would not be bound by the contract entered into by the promoters. Upon analogy it would seem the partnership entity would not be bound, though the point may not be of much consequence, since the liability of the individual defendants as promoters is often spoken of as the same liability as if they were partners. Their individual liability as partners is not because they en-

tered into a partnership but because they were promoters of a corporation.

III. The record with respect to the association of Courrier and Barron as promoters of the proposed corporation is without dispute. Mr. Courrier testifies to this association before the contract was entered into. The defendant Barron did not testify in the case.

The record with respect to Ashby's association with the other two is in dispute. The three defendants, Courrier, Barron and Ashby, were instructors at the Radio Institute in Chicago in the early months of 1947. Mr. Moran testified all three of the defendants were in his office in Chicago several times before signing the contract; that he remembered Mr. Ashby was present and more interested in the mechanical side of the business and he had him meet some of their employees who handled that end. He said that Barron and Ashby were both present in his office on February 24 when this contract was signed.

Courrier said that Barron and Ashby were not present when he signed the contract and that, although he and Barron were associated together at that time, Ashby did not join them in the enterprise until after the contract was signed. He said the contract was actually signed by him sometime in January 1947 instead of February 24, 1947, the date it bears—that the date was blank when he signed it. When asked when Ashby became a member of the enterprise he said: "February 1947." On cross-examination Mr. Courrier stated at one point that Mr. Ashby "didn't associate with us in the Mississippi Valley Broadcasting Corporation." But he also said all three were associated together in Chicago in the preliminary operations in February 1947; and that he discussed the news service with Mr. Ashby but it was after the signing of the contract. At another point in his cross-examination Mr. Courrier said he and Barron were using the name of the Mississippi Valley Broadcasting Corporation at the time Ashby came with them and the decision to abandon the corporation and form a partnership was made by all three of them.

Mr. Ashby testified he did not become associated with Courrier and Barron until the early part of March 1947—that he had not at any time talked with Moran until Moran came out

to Fort Madison in October of 1947. He said he had had no connection at all with the proposed enterprise of the Mississippi Valley Broadcasting Corporation. He said the three of them did become associated together while they were all in Chicago and they decided to open some form of company for a radio station in Fort Madison and after they came out to Fort Madison about the middle of March it was decided that a partnership would be the best way.

The question is one of fact. As previously pointed out, the promoter's liability extends to the contracts "directly or indirectly authorized or ratified." 18 C. J. S., Corporations, section 132; Roberts Mfg. Co. v. Wright, 62 Minn. 337, 64 N.W. 827. Under all of the testimony it fairly appears that Ashby was one of the promoters of the company that was to establish the radio station in Fort Madison. It also fairly appears, even from defendants' testimony, that they were all associated together at just about the time this contract was signed. Even accepting defendants' testimony we must believe Mr. Ashby knew all about the contract, for Courrier said he talked with him about the news service for the radio station and Ashby did not state that he did not know about this contract for such news service for their proposed station. Under the whole record we conclude the contract was either directly or indirectly authorized or ratified by Ashby. Roberts Mfg. Co. v. Wright, supra; Rhodes v. Carter, 181 Ark. 370, 26 S.W.2d 63; Johnson v. Hulse, 83 Cal. App. 111, 256 P. 551; Frazier v. Southern Counties Gas Co., 66 Cal. App. 609, 226 P. 833; Nichols v. Bodenwein, 107 Fla. 25, 146 So. 86; Vaughn v. Morris, Tex. Civ. App., 180 S.W. 954.

IV. There is no merit in the proposition urged by defendants that liability would not attach until the corporation was formed and it started broadcasting. The argument is based on the provision in the contract that the service was to start and payments were to be due when the broadcaster "started broadcasting", and continue for five years. Defendants argue the incorporation and commencement of broadcasting were conditions precedent. As we have shown, the formation of the corporation is not a condition precedent to a promoter's liability on a contract, even though entered into by the promoter in the

name of the proposed corporation. And under the contract the commencement of broadcasting was merely the beginning time for performance which was to continue for five years. That beginning time arrived when the promoters, who were individually liable, commenced broadcasting.

Defendants' liability does not depend upon whether there was an enforceable contract to incorporate. Their liability is a legal result of a promoter's contract. The promoter's decision not to incorporate would not work a release of plaintiff's obligations under the contract. In other words, a promoter's contract is a plain individual contract under which both parties can demand performance even though the tenor of the contract is that the proposed corporation will, when created, perform the promises the promoters make in the name of the unborn entity. Subsequent incorporation is not a condition which must exist before liability is fastened upon the promoters.

Perhaps commencement of broadcasting would be a condition. We need not explore the problem of the liability of the promoters if they decided not to enter the radio business in Fort Madison or had been refused a F.C.C. permit. The record shows they did enter the radio business, and they did start broadcasting—and it is significant they immediately called the plaintiff, with whom they had earlier contracted for news reports, to tell plaintiff of their decision to broadcast as a partnership. In any event, when plaintiff was notified that the individual promoters were now broadcasting it could well know the time had arrived for its performance under the contract—that the condition, namely, commencement of broadcasting, now existed.

■ ■ V. Defendants argue that the contract was rescinded by mutual consent. They point to this part of the record as establishing mutual rescission: "Mr. Courrier notified Mr. Moran of the decision of the defendants to operate as a partnership and Mr. Moran said he would come over and have them sign a new contract, which Mr. Courrier said would be alright."

The burden to establish rescission was on the defendants. Defendants do not argue a right to rescind based upon any act of plaintiff. The argument is based entirely upon the claim of mutual rescission—in other words, that plaintiff as well as defendants agreed to the rescission. Of course any contract

can be rescinded by the mutual agreement of the parties to it. O'Dell v. O'Dell, 238 Iowa 434, 26 N.W.2d 401. And the question whether the parties have so agreed is a question of fact under the evidence. We do not find such an agreement between the parties in the above testimony. There is the remark by one party, when learning of the partnership, that he would "have them [presumably the partners] sign a new contract" and the reply by the other, "that would be alright." Under all of the authorities the corporation, if the promoters had gone through with their original plan to incorporate, would not be bound by the contract, in the absence of a subsequent adoption by the corporation. 18 C. J. S., Corporations, section 122. The remark of Mr. Moran fairly indicates a desire that the new entity, the partnership, take over the contract, since this would now be the promoters' company that would do the contemplated broadcasting. But it does not indicate an agreement that the old contract was then and there rescinded. Nor does Mr. Courrier's remark "that would be alright" indicate a relinquishment of plaintiff's obligations to furnish the news service. Rather it indicates that the news service would be needed. There is further evidence of some negotiations concerning a new contract with the partnership relative to a reduction in price for the news reports but no new contract or agreement (which might possibly have rescinded the old) was ever entered into.

It must be remembered that defendants' individual liability on this contract is a legal consequence of their actions. Their liability is that of promoters and, as pointed out before, their liability would not have ended if the corporation had been formed and had adopted the contract. Admittedly a subsequent contract with the defendants as partners could have worked a novation or a mutual rescission of the old contract. We see nothing in the evidence relied upon except the opening negotiations for such a substitute contract—negotiations that ended in failure.

VI. Defendants argue that even if defendants were promoters they are not liable in damages because plaintiff suffered no loss. Their argument is that "appellant has suffered no loss or damage capable of any accurate determination"; that no recovery will be allowed for loss of profits that are remote or

speculative. Plaintiff claimed damages in the sum of $1918.80 as loss of profit. The evidence shows this amount was arrived at in the following manner. The contract provided for payments of $70 a week for the services, but this was reduced to $60 because another client was obtained in the area. The evidence showed the wire charge and the maintenance of the machines, if the contract were performed, would cost plaintiff $52.62, so the profit would be $7.38 per week or $1918.80 for five years.

Defendants seem to concede that loss of profits could be a proper item of damages but they question the cost figure, $52.62, stating it only includes the maintenance of the machines and wire rental and does not include "executive expense, administration expense, legal expense, accounting expense, or depreciation, other than depreciation of the machines actually in Fort Madison."

If performance of a contract for service is prevented by one party the other is entitled to all of the benefits he would have obtained had it been performed. 17 C. J. S., Contracts, section 469; Oakland California Towel Co. v. Sivils, 52 Cal. App.2d 517, 520, 126 P.2d 651, 652. And in such a case loss of profits that are not speculative or conjectural is basis for damages. Howard v. Brown, 168 Iowa 410, 148 N.W. 987.

The plaintiff who seeks damages for profits prevented is required to introduce evidence that will enable those profits to be evaluated with reasonable certainty. In Restatement of the Law, Contracts, section 331, page 515, the rule is stated: "Damages are recoverable * * * for profits and other gains prevented by the breach only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." And in comment b (page 516) under the above rule it is stated: "Profits are the net pecuniary gain from a transaction, the gross pecuniary gains diminished by the cost of obtaining them."

We think the proof here of damages for loss of profits was reasonably certain and the cost-of-performance figure, used to diminish the gross payments due, did not need to include what might be termed the overhead or fixed expenses, as argued by defendants. The record shows such items of ex-

pense would be constant whether this contract was performed or not. This being true, they were of no interest on the question of damages for nonperformance.

In answering a similar argument as that presented by the defendants here, the court in Oakland California Towel Co. v. Sivils, supra, said:

"* * * the true rule seems to be that the prospective profits should be diminished by charges composing an essential element in the cost of manufacture, or, as in this case, of service. Essential elements in such cost do not include remote costs, overhead or otherwise, but are confined to expenditures that would necessarily have been made in the performance of the contract. The only matter of concern is the detriment suffered or benefit lost as the result of the breach. If the fixed expenses neither increased nor decreased as a consequence of the nonperformance of the contract, there would be no loss or benefit arising from that factor."

The cause is reversed and remanded for judgment against the individual defendants in the sum of $1918.80.—Reversed and remanded.

All JUSTICES concur.