J. Presper Eckert, Jr. v. Commissioner.
Eckert v. Commissioner
Docket No. 75090.
United States Tax Court
T.C. Memo 1960-259; 1960 Tax Ct. Memo LEXIS 35; 19 T.C.M. (CCH) 1465; T.C.M. (RIA) 60259; November 30, 1960
*35 Held, payments received by petitioner during 1952 and 1953 from Remington Rand, Inc., represented additional compensation for the continued rendition of his services to Eckert-Mauchly Computer Corporation. Converse Murdoch, Esq., Three Penn Center Plaza, Philadelphia, Pa., for the petitioner. Frederick A. Levy, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in income tax against the petitioner for the taxable years 1952 and 1953 in the respective amounts of $264.60 and $459.04. The only issue for determination is whether the respondent has erred in treating certain payments to the petitioner of part of the profits of a corporation by which he was employed *36 and to which he had sold his stock as ordinary income rather than long-term capital gain. Findings of Fact Such facts as have been stipulated are found accordingly. Petitioner, during the years in issue, was an individual taxpayer residing in Gladwyne, Pennsylvania. He filed his individual income tax returns for the years 1952 and 1953 with the district director at Philadelphia, Pennsylvania. Petitioner's 1952 Federal income tax return was a joint return with his wife, Hester C. Eckert, who died on July 11, 1952. Neither letters testamentary nor letters of administration were ever issued on behalf of the estate of petitioner's deceased wife. Petitioner filed the petition in this action with respect to the year 1952 on behalf of himself since the entire deficiency in issue for that year is attributable to income of petitioner and is in no way attributable to the income of his deceased wife. Petitioner is an electrical engineer who received both an undergraduate and a graduate degree in electrical engineering from the University of Pennsylvania. Sometime during 1941, while he was a graduate student at the University and assisting in some of the laboratory courses being given *37 as part of the defense program, he met John W. Mauchly who had recently become a member of the staff of the School of Electrical Engineering at the University. Petitioner and Mauchly participated in the development of an electronic computer. The development of an electronic computer was initially undertaken pursuant to a contract between the University of Pennsylvania and the United States Army Ordnance Department. Sometime during 1945 petitioner and Mauchly completed the assembly of an electronic computer. At that time both of them were employees of the University of Pennsylvania. During the course of development of the electronic computer, petitioner and Mauchly discussed with the officers of the University of Pennsylvania the question of ownership of patent rights with respect to the electronic computer they were developing. As a result of these discussions, it was agreed between petitioner, Mauchly, and the University of Pennsylvania that petitioner and Mauchly would own the patents associated with the electronic computer, provided they granted a license of the patents to the University and any other eleemosynary institution, together with a right in the University of Pennsylvania *38 to sublicense the Government so as to enable the University to fulfill its contract with the United States Army Ordnance Department. The electronic computer developed by petitioner and Mauchly has come to be referred to as "Univac" and will be so referred to hereinafter. Following completion of the original Univac computer, petitioner and Mauchly continued to be employees of the University. They left the University in 1946 and, following a month during which they considered how best to further the development of electronic computers, they formed a partnership known as Electronic Control Company, hereinafter referred to as the Partnership. In December 1947, petitioner and Mauchly caused the formation of a corporation known as Eckert-Mauchly Computer Corporation, hereinafter referred to as Computer. On formation of this corporation, they caused the Partnership to transfer its property to Computer. This property consisted principally of basic patents relating to electronic computers developed by petitioner and Mauchly plus equipment which had been used in the business of the Partnership. Computer issued all of its stock to the Partnership in exchange for the property transferred. *39 The patents for Univac which were transferred to Computer on formation of that corporation included basic patents covering the field of digital electronic computers. After the formation of Computer, the corporation began to issue additional stock to certain of its key scientific employees and to a group of small investors. Sometime early in 1948 American Totalisator Company, hereinafter referred to as Totalisator, became interested in investing in Computer. At the time Totalisator became interested in investing in Computer, petitioner was serving as vice president of Computer and Mauchly was serving as president. In connection with the negotiations to secure Totalisator's investment in Computer, the former insisted that petitioner and Mauchly enter into a formal employment agreement with the latter corporation. On May 10, 1948, the petitioner and his partner, jointly and severally, entered into an employment agreement with Computer whereby each agreed for a period of 10 years from the date of the agreement to render personal services to the corporation at such compensation as the board of directors might from time to time determine and, in the event they should leave the corporation's *40 employment, not to directly or indirectly engage in employment with others competitive with the enterprise of Computer. In connection with Totalisator's investment in Computer, the two corporations executed an agreement, dated August 10, 1948, which provided, inter alia, for Totalisator to: (a) Loan Computer $50,000; (b) Contribute to the capital of Computer the amount of $38,000; and (c) Purchase 12,400 shares of Computer's stock at $5 per share. As a condition precedent to Totalisator's investment in Computer, as recited above, the former, by the August 10, 1948, agreement, required: (a) The amendment to Computer's Articles of Incorporation to provide for preemptive rights with respect to additional issuances of common stock. (b) The creation of a nine-member board of directors. (c) The amendment of the Articles of Incorporation of Computer to require the consent of two-thirds of the common stockholders of Computer to change the number of directors, authorize additional shares, amend the Articles of Incorporation or by-laws, or to merge, consolidate, or sell the assets of the corporation. (d) The amendment of Computer's by-laws to provide for a two-thirds vote of *41 the Board of directors before changing the terms of employment of any executives. (e) An agreement that Totalisator should elect four of the nine directors of Computer. Petitioner's first salary with Computer was at the rate of $10,000 per year, which amount was increased to $15,000 per year sometime prior to February 1950. From 1948 to February 1950, Computer was engaged in the business of designing the Univac electronic computer and in connection with this engaged in some governmental work. Throughout this period, petitioner continued to serve as a vice president of Computer. During that period, Mauchly served as president of Computer. Late in the calendar year 1949, a "Mr. Strauss" was secretary and treasurer of Totalisator and was the person largely responsible for management and operation of that company. At the same time, Strauss was serving as chairman of the board of directors of Computer. Late in the year 1949, Strauss and the then general manager of Totalisator were killed in an airplane crash near Conowingo Dam. Totalisator's investment in Computer had been almost entirely based upon the interest of Strauss in Computer's operations. Following the death of Strauss, *42 the president of Totalisator, Charles Munn, the vice president, Ecker Munn, and the latter's brother, Gerber Munn, who had a financial interest in Totalisator, indicated their desire to eliminate Totalisator's interest in Computer and requested petitioner and Mauchly to assist them in finding a buyer for their interest in Computer. Pursuant to this request by the Munns, petitioner and Mauchly proceeded to attempt to secure a purchaser for the interest of Totalisator in Computer. In attempting to accomplish such a sale, petitioner, Mauchly, and Totalisator worked closely together and kept each other informed as to their efforts. During the time Totalisator was attempting to dispense with its Computer stock, Remington Rand, Inc., hereinafter referred to as Rand, became interested in the business of Computer and indicated to the partners that it was not interested in purchasing only a portion of Computer's outstanding stock but was interested in acquiring the whole thereof. Petitioner and Mauchly, in negotiating with representatives of Rand, asked as one of the considerations that they be given a 5 per cent interest in the profits of Computer for 10 years. On the other hand, Rand, *43 in the negotiations, insisted that this share of the profits should be limited to a period of 5 years. As a result of the negotiations between petitioner, Mauchly, and representatives of Rand, on February 6, 1950, Partnership and Rand executed an agreement under which Partnership undertook to sell to Rand 17,835 shares of common stock of Computer and 1,500 shares of the preferred stock of Computer, that being all of the outstanding stock of Computer, other than that owned by Totalisator. The February 6 agreement recited the fact that 1,500 shares of the common stock and a like number of shares of the preferred stock were then controlled by certain individuals other than petitioner and Mauchly; and that, in the event the Partnership was unable to deliver such shares owned by the other individuals, the sale would proceed without transfer of such shares owned by the other individuals, but with an adjustment to the total purchase price. The February 6, 1950, agreement provided for a purchase price for the 17,835 shares of common stock and 1,500 shares of preferred stock of $120,000 plus Rand's agreement to pay to the partnership for a period of 8 years from the closing of the sale *44 5 per cent of the profits of Computer, with an annual minimum guarantee of $5,000 per year commencing 2 years after the date of the agreement. At no time during the negotiations leading up to the execution of the February 6, 1950, agreement between Partnership and Rand was there any discussion between petitioner, Mauchly, or representatives of Rand with respect to petitioner's or Mauchly's entering into an agreement to be employed by Computer or Rand or with respect to their agreements to desist from competitive activities. Pursuant to a letter agreement of February 6, 1950, Totalisator sold to Rand 12,400 shares of common stock of Computer and 2,857 shares of 4%, $35 par value preferred stock of Computer for an aggregate price of $365,365. By virtue of the same letter agreement, Totalisator sold to Rand notes of Computer with an aggregate face value of $137,800 for $10,000. Following execution of the February 6, 1950, agreement between Partnership and Rand, it developed that the owners of the shares of Computer (other than the Partnership) covered by the February 6, 1950, agreement between Partnership and Rand were not willing to sell their shares at the price determined by *45 the February 6, 1950, agreement. Such other stockholders decided they preferred to negotiate for the sale of their shares directly with Rand. This necessitated some further negotiations with Rand with respect to the sale of the stock of Computer owner by Partnership. These negotiations resulted in the execution on February 15, 1950, of an agreement supplemental and additional to the February 6, 1950, agreement by which Rand agreed to purchase from the Partnership 13,500 shares of Computer common stock and to pay $74,379.15 in cash plus other consideration. The agreement stated that the petitioner and Mauchly were presently bound to Computer by the employment agreement dated May 10, 1948, and further stated: 3. The CORPORATION [Rand] agrees that in addition to the foregoing payment and in addition to compensation to be paid to John W. Mauchly and John Presper Eckert, Jr., and in consideration of their employment by Eckert-Mauchly Computer Corporation or an affiliate thereof, or by the CORPORATION or an affiliate, the CORPORATION will for a period of eight years (8 years) from the date of this agreement on condition that neither the said John W. Mauchly and John Presper Eckert, *46 Jr. shall during this period engage in competitive employment for the benefit of himself or others in which event all payments shall cease, cause to be paid to the COMPANY [the Partnership] an amount equal to Five Percent (5%) of the net profits after all taxes, realized by the Eckert-Mauchly Computer Corporation * * * The contract guaranteed the petitioner and Mauchly an $18,000 yearly salary during the balance of their employment by Computer and that it would be binding upon successors to Computer and guaranteed the profits to be at least $5,000 annually after February 15, 1952. In addition, Rand was to pay to the Partnership an amount equal to one half the income derived during the term of the agreement from the license or sale of patents based upon the inventions of the petitioner or Mauchly. The contract also provides that for the purposes of this agreement, the purchase of 2,835 shares of Computer common stock from seven named individuals for the separate consideration listed therein should be treated as being purchased from the Partnership. In addition, for the purposes of distribution of the 5 per cent of net profits (or $5,000 minimum) and the one half of Rand's patent *47 income from the petitioner's and Mauchly's inventions, the seven individuals were to receive a stated proportion. The names, shares sold, and percentage of subsequent payments to be received by each of these seven individuals are listed below: Shares Sold
Percentage
Calvin S. Bosin
100
2 1/2
George V. Eltgroth
230
5
Robert F. Shaw
659
5
C. Bradford Sheppard
823
1
John C. Sims, Jr.
100
2 1/2
H. Fraser Welsh
823
6
James R. Weiner
100
5
In executing the February 15 agreement petitioner and his partner were aware of the provisions of paragraph 3 thereof and in agreement with the terms thereof except that they believed such terms to be surplusage in view of their May 10, 1948, agreement with Computer. Petitioner, at the time of the insertion of this provision in the agreement, stated to representatives of Rand who were participating in the negotiations that the insertion of this provision was agreeable to him and that he assumed he would be entitled to treat payments under the percentage of profits provision as capital gain. Paragraph 10 of the February 15 agreement provided that Rand would increase the annual salaries of petitioner and Mauchly *48 during the balance of the term of their employment agreement, i.e., until May 10, 1958, to at least $18,000 each and would consider such May 10, 1948, employment agreement as binding upon Computer and its successors. During the calendar years 1952 and 1953, petitioner received from Rand $1,825 each year, representing his share of the $5,000 minimum payment as provided under paragraph 8 of the February 15, 1950, agreement. Such payments of $1,825 were not reflected in the Treasury Department Form W-2 (income tax withholding statement) furnished to petitioner by Rand for either the year 1952 or 1953. Ultimate Finding of Fact The sum of $1,825 received by petitioner from Rand in each of the years 1952 and 1953 constituted payments of additional compensation for the continued rendition of his services to Computer corporation. Opinion The issue here presented is one of fact. There is no dispute between the parties concerning the applicable law. If, as petitioner contends, the provision for a guaranteed share of the profits of Computer was additional payment for stock of that corporation sold to Rand by the partnership, payments to petitioner of such profits would constitute part *49 of the cost of a capital asset agreed to have been held for more than 6 months and taxable only as long-term capital gains. If respondent is correct in his determination of deficiencies herein, the share-of-profit payments are in consideration for the services rendered and to be rendered by petitioner to Computer for the remainder of the term of his employment agreement and his agreement not to engage in competitive employment. We have, by our ultimate finding, disposed of the issue. It is amply shown by this record that the profit payments were not intended as consideration for the stock of Computer transferred to Rand by the Partnership. The purchase price of such stock was fixed by both the February 6 and February 15 agreements after negotiation. Certainly if the price fixed was to be augmented by further payment, the agreements would have clearly expressed that intention, particularly after negotiation during which the subject of taxation was discussed. The price paid by Rand for the Computer stock held by Totalisator is not, under the circumstances of this case, indicative of an intent by the parties to these agreements that the contract sale price was to be considered less *50 than the actual price of such stock. It is true that the purchase price of the stock held by Totalisator was greatly in excess of that held and sold by the Partnership, but because of Rand's desire to obtain complete ownership of the stock of Computer and its interest in the field of electronic computers, we do not think its purchase of the former stock was the result of an arm's length transaction. While petitioner and his partner each testified that they thought the profit payments were additional payments for the stock, the record does not indicate that Rand so construed the agreements. In fact, from the wording of the agreement of February 15, it is clear that Rand considered the profit sharing to be in consideration for the partners' agreement to be employed by Computer and not to engage in competitive employment. If petitioner had such an idea, we see nothing in the record which would justify it. What then, on February 6 and February 15, 1950, did petitioner and his partner possess, the sale of which could account for the profit payments? They had disposed of all their stock in Computer which, together with the stock held by Totalisator and the other small investors acquired *51 by Rand, gave that company complete control of Computer and all of its assets. It is clear that the partners still possessed an exceedingly valuable asset which was necessary for Computer's continued operation and success. That asset was their particularly unique skill and experience with respect to the invention and past development of an electronic computer which Computer was engaged in further developing and marketing. It is true the partners had in May of 1948 agreed to be employed by Computer until May of 1958 and not to engage in competitive employment during that period, but in the United Statesan agreement to perform personal services is not subject to an action to enforce specific performance. Tucker v. Warfield, 119 F. 2d 12; Shubert v. Woodward, 167 F. 47; Life Preserver Suit Co. v. National Life Preserver Co., 252 F. 139; King Features Syndicate v. Courrier, 241 Iowa 870, 43 N.W. 2d 718. The only remedy left to an employer is an action for damages for breach of such an agreement. Fiedler, Inc. v. Coast Finance Co., 129 N.J.E. 161, 18 A. 2d 268; *52 Osius v. Hinchman, 150 Mich. 603, 114 N.W. 402; Moklofsky v. Moklofsky, 79 Cal. App. 2d 259, 179 P. 2d 628. It was therefore imperative that Rand and Computer induce petitioner and his partner to remain in the employment of one or the other of these corporations until at least such time as Univac had been sufficiently developed that it was marketable. We are satisfied that it was the necessity for such an inducement that give rise to the profit-sharing provision of the February 15 agreement. It is equally clear that the agreement not to engage in competitive employment was not consideration for the profit-sharing payments for Computer already had acquired that agreement in May of 1948 and such agreements are enforceable. Payments by an employer made to induce continued employment are compensatory in nature and constitute ordinary income. Sec. 61(a), I.R.C. 1954; Jessie S. Rinehart, 18 T.C. 672; Batterman v. Commissioner, 142 F. 2d 448, affirming per curiam a memorandum opinion of this Court [Dec. 13,018(M)]; *53 cf. Jerecki Manufacturing Co., 12 B.T.A. 1165. Decision will be entered for the respondent.