# McDANIEL *v.* SERVICE FEED AND SUPPLY, INC.

[No. 204, September Term, 1973.]

*Decided April 1, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE and ELDRIDGE, JJ.

*William K. Connor* for appellant.

*Charles B. Keenan, Jr.,* with whom were *Cameron & Reed* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

This is an appeal from a judgment in the sum of $16,053.87 entered by the Circuit Court for Harford County (Close, J.) in favor of Service Feed and Supply, Inc. against

appellant, Dorothy Davis McDaniel. Although judgment was also obtained against her husband, William K. McDaniel, he later dismissed his appeal. The single question presented by this appeal is whether appellant is liable as a promoter for the debt of a corporation which was to be formed but never came into existence. The trial court, sitting without a jury, held that she and her husband were liable as promoters, and from the judgment entered thereon, she prosecutes this appeal.

The McDaniels are the owners of 800 acres in Harford County known as Indian Spring Farm. In addition, they operate a restaurant in Mount Holly, New Jersey. Early in 1971, they received a visit at their restaurant from a Mr. William A. Zimmerman (Zimmerman), president and general manager of Agricultural Industries, Inc. (AG Industries), a Pennsylvania corporation engaged in providing technical expertise and management for cattle feeding and breeding operations. As a means of marketing its services, it assembles landowners and potential investors for the purpose of organizing companies that might employ AG Industries.

Initially, Mr. McDaniel expressed an interest only in leasing the farm to the group which Zimmerman was endeavoring to form. Eventually, however, he exhibited a desire to also become an investor in the enterprise if additional capital was obtained from other sources. Later, Zimmerman visited the McDaniel home in New Jersey and informed him that he had gathered the nucleus of an "investment group" consisting of one Weston Vogel (Vogel) and the Mumma Gas and Oil Company, represented from time to time by its principal, Clyde Mumma, Sr. (to whom we shall collectively refer as Mumma).

On May 2, 1971, Vogel, Zimmerman and McDaniel, and their wives, met at the farm to discuss the feasibility of the proposed operation, and to schedule another meeting. On May 15, an all-day meeting occurred at the farm. The first part consisted of a technical slide presentation on animal breeding and feeding by a pair of consulting experts, Dr. T. W. Perry, an animal nutritionist, and Dr. Lowell Wilson, a

geneticist. A number of other persons were also present, including David Gross (Gross), AG Industries' farm manager, and some of its stockholders.

Following the slide presentation, those assembled divided into two groups, one to discuss management of the proposed undertaking, and the other to discuss finances. The latter consisted of the McDaniels, Vogel, Mumma, Zimmerman and Mumma's attorney. What transpired in that meeting is not entirely clear, perhaps because neither Vogel, Mumma, nor the attorney testified.

Although there are some differences over what was said, it is at least clear that those present arrived at a tentative agreement for the lease of the farm to a prospective corporation, Indian Spring Cattle Company, Inc., for a cattle feeding and, possibly, a breeding operation. In addition, there was testimony — confirmed by Mr. McDaniel — that he was to have a 20% interest in the corporation. They also discussed the comparative merits of forming a partnership or a corporation. Both Mr. and Mrs. McDaniel actively participated in this conference in which they discussed the organization of the company and its financial structure. One question which was left unresolved at that meeting was when the first crop would be planted, it being generally recognized that little time remained for that purpose if an entire year were not to be lost.

With respect to the financial structure, a meeting was held in Florida in early June, attended by Mr. McDaniel, Vogel and Mumma. At that meeting, a contract was submitted and read, but was not signed because of a disagreement between Vogel and Mumma which was never reconciled. Nor was a lease of the farm executed.

In the meantime, immediately following the May 15 meeting Gross advised Zimmerman that if planting did not begin immediately, there would be no feed for a cattle operation that year. This triggered a furious round of telephone calls. Zimmerman called Vogel for permission to plant; the latter instructed him to call Mr. McDaniel for authority to do so, saying, "don't worry about the financing, Bill McDaniel and I will work it out." Zimmerman then

called Mr. McDaniel on May 17, and claims the latter granted permission to plant the first 200 acres. Although Mr. McDaniel insists that he merely referred Zimmerman to Mumma, there is no question but that the planting did occur with the knowledge and, at the very least, the tacit consent of Mr. and Mrs. McDaniel. On the strength of the McDaniels' consent, Zimmerman authorized Gross to begin planting. The latter purchased fertilizer, seed and herbicide for that purpose from appellee whose unpaid bill is the subject of this litigation.

In rendering judgment against the McDaniels, the trial judge found that although they initially entered the picture merely as potential landlords, they eventually did become interested in participating as investors; and that when additional capital appeared to be available, they "took a more active role in organizing the financial structure of the company." As he said in his carefully considered opinion:

> "... Meetings were held at the Indian Spring Farms, there was talk of the relative merits of corporations and partnerships, the McDaniels entered into negotiations with the financing group and McDaniel tentatively determined that he would secure a 20% interest in the company. *It is clear that at the time of the planting of the crop the McDaniels regarded themselves as potential principals in the company....*" (emphasis added).

As a result, he found the McDaniels liable as promoters of the aborted corporation to which the credit had been extended by appellee. In attacking this ruling, appellant "adopts the factual portion" of the trial judge's opinion, which she says "fully and accurately recited the facts of the case." Thus, appellant accepts the court's findings of fact, but maintains that those findings are insufficient to support the trial judge's conclusion that Mrs. McDaniel was a promoter. She does not contend as, indeed, she cannot, that based on the evidence presented, the court erred in making its findings, particularly in view of the testimony by at least one witness, Zimmerman, "that they [the McDaniels] would

have participation [as principals in the corporation]." Thus, we are presented with the question whether the trial court properly held her liable as a promoter. We think it was correct in this determination, and therefore affirm.

We consider, then, whether the facts, as found by the trial judge, are sufficient to establish that appellant was a promoter. In *Crosse v. Callis*, 263 Md. 65, 282 A. 2d 86 (1971), Judge Smith, for the Court, quoting from 1 Fletcher, *Cyclopedia Corporations* § 189 (1963 Rev. Vol.) and the frequently cited case of *Old Dominion Copper Mining & Smelting Co. v. Bigelow*, 203 Mass. 159, 177, 89 N. E. 193 (1909), *aff'd on other grounds*, 225 U. S. 111, 32 S. Ct. 641, 56 L. Ed. 1009 (1912), adopted this definition of a promoter:

> " 'In a leading American case it is said that "the word 'promoter' has no precise and inflexible meaning in this country," which seems to be true in England as well; but it is also said that "in a comprehensive sense 'promoter' includes those who undertake to form a corporation and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business." ' " 263 Md. at 72.

Another definition of "promoter" is found in Black's Law Dictionary, 1379 (4th ed. rev. 1968):

> "One who promotes, urges on, encourages, incites, advances, etc. . . . One promoting a plan by which it is hoped to insure the success of a business venture. . . .
>
> "The persons who, for themselves or others, *take the preliminary steps to the organization of a corporation.* 1 Thompson on Corporations, § 81. (other citations omitted). Those persons who first associate themselves together for the purpose of organizing the company, issuing its prospectus, procuring subscriptions to the stock, securing a charter, etc. See Dickerman v. Northern Trust Co.,

176 U.S. 181, 20 S.Ct. 311, 44 L.Ed. 423 (1900)." (emphasis added).

In *Dickerman v. Northern Trust Co., supra,* the Supreme Court defined a promoter as:

"... one who 'brings together the persons who become interested in the enterprise, aids in procuring subscriptions and sets in motion the machinery which leads to the formation of the corporation itself.' (citation omitted). Or, as defined by the English statute of 7 & 8 Vict. chap. 110, sec. 3, 'every person acting, by whatever name, in the forming and establishing of a company at any period prior to the company' becoming fully incorporated. . . ." 176 U. S. at 203-04.

For numerous additional definitions of the term, "promoter," see 34 *Words and Phrases, "Promoter"* at 558-62 (1957).

It is generally agreed that whether a person is actually a promoter is a question of fact to be determined by the trier of fact, 1 Fletcher, *Cyclopedia Corporations* § 189 (1963 Rev. Vol.); *see Isle of Thye Land Co. v. Whisman,* 262 Md. 682, 703-04, 279 A. 2d 484 (1971). In view of the trial court's finding of fact that the McDaniels took an active role in organizing the financial structure of the corporation, the judgment, insofar as it rested on the determination that Mrs. McDaniel was a promoter, was not clearly erroneous, Maryland Rule 886. Furthermore, the activity of Mrs. McDaniel described by the trial court falls easily within the definition of a promoter as enunciated above.

A subsidiary question, one which we seem not to have decided previously, is the liability *vel non* of a promoter when the corporation is actually never formed. In *King Features Syndicate v. Courrier,* 241 Iowa 870, 43 N.W.2d 718, 41 A.L.R.2d 467 (1950), where promoters of a corporation breached a contract involving news reports and the corporation was never organized, the court said:

". . . As pointed out, the authorities generally are to

the effect that [the promoters'] *individual liability would not have ended if they had formed the corporation. Why then should it be said that their individual liability ceased when they abandoned the plan to incorporate?* We hold the individual defendants jointly and severally liable under the contract." 43 N.W.2d at 723 (emphasis added).

Similarly, in 18 C.J.S. *Corporations*, § 132, it is stated:

". . . [I]f [promoters] assume to make contracts in the name of the proposed corporation and then voluntarily abandon their purpose of forming it, they become personally liable to make good those contracts, and each becomes liable to make good such as he has directly or indirectly authorized or ratified."

These authorities reflect the majority view that even where the promotion is abandoned, the general rule that promoters are liable on preincorporation contracts, in the absence of an agreement to the contrary, prevails. Thus, in the case at bar, there being no question of AG Industries' authority, through its employee, Gross, to act as agent for the promotion in making the purchases from appellee, appellant's liability is unaffected by the abandonment of the undertaking. Since the sole question presented to us, whether she is liable as a promoter, was correctly decided by the trial judge, we will not disturb his decision.

*Judgment affirmed; appellant to pay costs.*