[L. A. No. 17954.   In Bank.   Feb. 13, 1942.]

GEORGE W. HALSEY et al., Appellants, v. M. R. ROBIN-SON et al., Respondents.

Brittan & Mack for Appellants.

Harvey, Johnston & Baker for Respondents.

HOUSER, J.—The plaintiffs herein appeal from a judgment rendered on the defendants' cross-complaint by which the court decreed specific performance of a lease.

The plaintiffs, George W. Halsey and Frances L. Halsey (husband and wife) and Joseph Halsey, who are the owners of farm land in Kern County brought this action to compel restitution of the property which was held by M. R. Robinson and his wife under a purported lease. The plaintiffs also sought to recover rents, profits and damages which allegedly had accrued during the withholding period. The defendants answered and cross-complained, asserting they possessed a leasehold interest in the land, also claiming they were holding under an agreement for a renewal lease and asking for a decree of specific performance of such lease. The findings made by the trial court in favor of the defendants and cross-

complainants were based on the following factual situation as revealed by the evidence:

The defendants had held the land here involved since 1936 under successive leases from the plaintiffs, who resided in Los Angeles. At the time this litigation arose the defendants were in possession of the farm under a lease for the year 1940, which had been executed by plaintiff George W. Halsey as lessor. In December, 1939, at the time such lease was entered into, some discussion was had between the parties thereto relative to the renewal of the lease at the expiration of the 1940 term. Again in the early part of 1940 defendant Robinson and George W. Halsey carried on correspondence with respect to a proposed renewal of the lease, and on May 30, 1940, Halsey wrote to Robinson with regard to certain conditions on which he would execute a five-year renewal lease and asked Robinson to make a bid therefor. On June 4, 1940, Robinson replied to that communication, advising Halsey that he would pay $1,000 a year as rental under the proposed renewal lease and stating that he desired an early reply because he wished to do some leveling of the land during the following month. On June 7, 1940, Halsey again wrote to Robinson, stating that the lessors would give him a lease for five years beginning January 1, 1941, on the condition that Robinson would meet the payment of an expenditure which had been incurred on the farm in connection with the installation of a pump and well, and on the further condition that Robinson would agree to make three separate rental payments each year, aggregating the sum of $1,000 annually during the five-year term. That letter concluded with the statement that if Robinson felt he could handle the new lease under the specified terms he could begin to level the land. The facts just related are not in dispute. However, the evidence includes testimony with respect to other facts, which was sharply conflicting. Robinson testified that on June 10 he wrote to Halsey and accepted the terms as set forth in the letter of June 7, and advised that he would "start leveling" the land; and there was evidence to show that shortly thereafter the defendants made improvements on the farm to the extent of approximately $400 in value. Halsey denied having received the purported acceptance letter, but two witnesses corroborated Robinson's testimony with respect thereto. The evidence also shows that subsequent to the

time Robinson received the letter of June 7, and prior to November 14, 1940, George W. Halsey and his wife visited Robinson at the farm, where they had some discussion relative to a proposed change in the terms of the renewal lease, although no such change was ever effected. Thereafter, and on November 14, 1940, the defendants visited the Halseys in Los Angeles, at which time Robinson delivered to George W. Halsey written proof of his payment of the expenditure relating to the pump and well. At such time and place the parties again discussed the matter of the five-year renewal lease; and the defendants testified that George W. Halsey thereupon fraudulently represented to them that before a formal renewal lease could be executed, and in order to clear the record, it would be necessary for the Robinsons to execute a quitclaim deed to the property, and that he advised them the renewal lease would be executed immediately after they turned over to him the said quitclaim deed. The defendants testified further that in reliance on such representations they delivered to Halsey a quitclaim deed, but that immediately thereafter he refused to execute a renewal lease and informed them the land was being sold and they "would have to get off the place." They also testified that during that conversation at the Halsey home George W. Halsey offered Robinson the sum of $200 for "making the trip to Los Angeles," but that Robinson refused to accept it and informed Halsey that he had entered into an agreement for a five-year lease to the land and would not move from the farm. In his testimony, Halsey denied that the conversation had on November 14 was as related by the defendants, but stated that on such occasion he told the defendants he had secured a purchaser for the farm and that they would have to give it up for that reason—whereupon, he asserted, they agreed to execute the quitclaim deed. Halsey admitted having offered Robinson the sum of $200, but testified that such sum was tendered as reimbursement for the improvements made on the land by the defendants.

Shortly after the quitclaim deed was executed, it was recorded by the plaintiffs, who thereupon gave the defendants a thirty-day notice to vacate. In December, prior to expiration of the 1940 lease, and in reliance on the validity of the quitclaim deed, the plaintiffs instituted the present action.

The principal question presented for determination

here is whether the findings were sufficiently supported by the evidence. As heretofore indicated, a reading of the transcript reveals a conflict in the evidence on the question whether Halsey received notice of Robinson's acceptance of the terms of the June 7 letter, also as to what was said and done by the parties at the Halsey home on November 14 when the quitclaim deed was executed. The trial court resolved all conflicts in favor of the defendants. It made findings to the effect that there was a valid written acceptance of the June 7 letter: that commencing on that date Robinson began to and did level and improve the land to the value of over $400, which improvements were not required by the terms of the 1940 lease under which the Robinsons were then in possession of the land but were made solely in consideration of the terms of the letter of June 7; that on or about the 13th day of August, 1940, the plaintiffs inspected the property and were shown the improvements so made; that at that time and place they requested the defendants to change the terms of the purported five-year lease from a "cash rental" to a "crop rental" basis, which request was refused by the defendants; that the latter executed the quitclaim deed solely by reason of the false and fraudulent representations of George W. Halsey as to the purported necessity therefor and on his promise that immediately thereafter a five-year renewal lease would be executed in favor of the defendants; and that by reason of the matters and things as set forth in the findings herein, the plaintiffs were estopped to deny that the conditions and terms of the June 7 letter were fully binding on them.

Aside from the fact that under well-settled principles of law this court may not disturb findings based on conflicting evidence, on an examination of the entire record we are of the view that there was ample evidence to sustain the findings just referred to, including the finding that the quitclaim deed was in fact executed by the defendants solely because of the false and fraudulent representations of plaintiff George W. Halsey. Several inconsistencies appear in his testimony. Thus, although he denied having received Robinson's acceptance of the June 7 letter, his conversation with Robinson at the farm in August, at which time he proposed that the terms of the five-year lease be changed from a cash basis to a crop rental basis, imports a recognition by him of an existing agree-

ment under which the Robinsons were to be given a renewal lease. Moreover, having been present in person at the farm on that occasion, Halsey had constructive, if not actual, notice that among other improvements made to the land, some ''leveling'' had been done—a project which was contemplated by the terms of the Halsey letter of June 7, conditional on Robinson's acceptance of such terms. The fact that thereafter Robinson had proceeded to level the land gives rise to the inference that he had in fact taken the necessary steps to assure himself that the lease would be renewed, before assuming the hazard of making any such improvements. Nor would it appear reasonable to assume—in accordance with the testimony of plaintiff George W. Halsey—that on the occasion on which the defendants executed the quitclaim deed they voluntarily consented to do so solely on Halsey's statement that he intended to sell the land. Robinson's prior letters to Halsey and his actions thereafter, including payment of the pump and well expenditure, reveal a continuous effort on his part to effect a renewal of the lease and to meet the conditions advanced by George W. Halsey as a prerequisite thereto. Moreover, had the defendants willingly consented to execute the quitclaim deed solely because Halsey told them he intended to sell the land, and for that reason indicated their willingness to vacate the property, no explanation is suggested for Robinson's refusal to accept the $200 which George W. Halsey offered him, if, in accordance with Halsey's testimony, it was tendered as reimbursement for the improvements made on the land. The fact that Robinson refused to accept the money—and Halsey admitted it was refused—affords strong proof that the version given by the defendants of the conversation and actions of the parties hereto at the Halsey home on November 14, was true and correct, and that the testimony given by Halsey in that respect was false.

In view of our conclusion that the trial court was correct in finding that the plaintiffs were estopped to deny the validity of the June 7 writing, no further consideration need be given the plaintiffs' contention that it was the intention of the parties to reduce their contract (the letter of June 7) to a more formal writing before being bound thereby —and having failed to do so there was no contract which could be enforced. As reflected by the findings of the trial court, the facts of this case which give rise to an estoppel

afford no basis for the application of the rule of law which is embodied in that contention.

Nor, in the light of the trial court's ruling as to estoppel, is it necessary to give consideration to the plaintiffs' contention that there was no memorandum of the agreement to execute a lease sufficient to satisfy the statute of frauds.

In *Hambey* v. *Wise,* 181 Cal. 286, 289 [184 Pac. 9], the court said: ". . . in general relief is given . . . first, where to allow the statute [of frauds] to be set up would be to secure to the party relying upon it the fruits of actual fraud . . ." Due to the presence of actual fraud in the present case, there can be no doubt but that the trial court here was warranted in finding that the plaintiffs were estopped to set up the statute of frauds under the rule stated in the cited case. The equitable doctrine of estoppel to raise the statute of frauds has been judicially recognized and frequently applied in this state since 1909 when the decision in *Seymour* v. *Oelrichs,* 156 Cal. 782 [106 Pac. 88, 134 Am. St. Rep. 154], was rendered. (See, also, *Wilson* v. *Bailey,* 8 Cal. (2d) 416, 421 [65 Pac. (2d) 770] ; *Notten* v. *Mensing,* 3 Cal. (2d) 469, 474 [45 Pac. (2d) 198] ; *Fleming* v. *Dolfin,* 214 Cal. 269 [4 Pac. (2d) 776, 78 A. L. R. 585] ; *Kraft* v. *Rooke,* 103 Cal. App. 552, 556 [284 Pac. 935] ; 19 Cal. L. Rev. 80.) That such doctrine serves a just and salutary purpose in the field of equity jurisprudence is well illustrated by its application to the facts of this case. Here a valuable property right was sought to be wrested from these defendants who, the record shows, were farming people of limited education and who, due to their lack of familiarity with legal procedure and business methods in general, were willing to and did rely on the promises and representations of the plaintiffs in executing the quitclaim deed.

There is no merit in the contention that the June 7 letter, having been written and signed only by George W. Halsey, would not be binding on the other two co-owners of the land. There is evidence in the record to show that both of the latter had full knowledge of the several leases to the Robinsons from 1936 up to and including the 1940 lease, and that prior to the institution of the present action neither of the two co-owners ever made any objection to any of the leases which had been made to the Robinsons. (See *Swartzbaugh* v. *Sampson,* 11 Cal. App. (2d) 451 [54 Pac. (2d) 73],

pp. 462, 463.) The evidence also was sufficient to show a ratification by the co-tenants of the purported agreement of June 7 (*Bessho* v. *General Petroleum Corp.*, 186 Cal. 133 [199 Pac. 22], p. 141) which, in part, was evidenced by their reliance on the quitclaim deed in prosecuting the present action (Restatement, Agency, vol. I, sec. 97, p. 241).

Nor is there merit in the claim that the renewal lease, which by the terms of the judgment the plaintiffs were ordered to execute, was not just, fair and equitable. In essence, it was not essentially different from the former leases which the parties had executed. The court directed that the renewal lease specify a yearly rental of $1,000, and such is the amount which the plaintiffs demanded by the letter of June 7.

From the foregoing it follows that the judgment should be and it is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Carter, J., and Traynor, J., concurred.