PARAMOUNT PICTURES CORPORA-
TION, a corporation, Plaintiff,

v.

William HOLDEN; The Mirisch Company, Inc., a corporation; United Artists Corporation, a corporation, Defendants.

No. 638–58.

United States District Court
S. D. California,
Central Division.

Oct. 13, 1958.

Mitchell, Silberberg & Knupp, Los Angeles, Cal., by Arthur Groman, Los Angeles, Cal., for plaintiff.

Belcher, Henzie & Fargo, Los Angeles, Cal., by Frank B. Belcher, Los Angeles, Cal., for defendant William Holden.

Kaplan, Livingston, Goodwin & Berkowitz, Beverly Hills, Cal., by Eugene S. Goodwin, Beverly Hills, Cal., for defendant The Mirisch Co., Inc.

Gang, Tyre, Rudin & Brown, Los Angeles, Cal., by Martin Gang, Los Angeles, Cal., for defendant United Artists Corporation.

YANKWICH, Chief Judge.

On June 26, 1958, plaintiff, Paramount Pictures Corporation, a New York corporation,—to be referred to as Paramount, —instituted an action for declaratory relief against William Holden, a well-known motion picture artist.[1] Our jurisdiction is based solely on diversity.[2]

I

*Brief Summary of the Pleadings*

The original Complaint set forth a contract entered into on the 16th day of April, 1951, between Paramount and Holden which was to continue for a period sufficient to produce fourteen photoplays, "the production year" being defined in terms which need not be gone into in detail. This will be referred to as "the old contract". The Complaint then alleged that, pursuant to negotiations on October 12, 1956, plaintiff and defendant entered into a new oral agreement,—to be referred to hereinafter as "the new contract",—to take the place of the old one, the terms of which it modified. A memorial of this agreement was to be executed later.

The Complaint then stated that on November 29, 1957, Paramount sent to Holden a notice designating January 2, 1958, as the starting date for the first of six photoplays in which the defendant was to render his services under the new contract.

On February 10, 1958, the Complaint continued, Holden advised them that he had never entered into the new contract, after allegedly the time for the commencement of his services under it had been extended at the request of Holden's agent. Whereupon Paramount declared him in default and suspended him in accordance with the provisions of the new contract.

The notice and letter of suspension will be set forth in full further on in the discussion.

The prayer requested that the rights of the parties be declared and that the Court decree that the contract of October 22, 1956, is a valid and enforceable contract. It also prayed for general relief.

In the Amended Complaint filed on September 10, 1958, Mirisch Company, Inc., a corporation, and United Artists were joined as defendants. The first cause of action was, in substance, the same as the one contained in the original Complaint. A second cause of action set forth the fact that, since the commencement of the first action, Holden had given

1. 28 U.S.C.A. §§ 2001, 2202; Rule 57, Federal Rules of Civil Procedure, 28 U.S.C.A.

2. 28 U.S.C.A. § 1332.

them notice that he intended to perform services in a photoplay to be produced by Mirisch Company and released by United Artists.

Alleging that the production of such picture ("The Horse Soldiers") would result in irreparable damage to them, and that, as a result of an alleged conspiracy entered into by Holden, Mirisch and United Artists, the Complaint again asked that the contract of October 22, 1956, be declared valid and that Holden be enjoined from performing any services for the other defendants and that they be enjoined from employing him or advertising the fact that he will make a motion picture for them.

Other allegations will be referred to in the discussion to follow.

Before us is an application for interlocutory injunction pending trial. Because of their bearing upon that issue, it is well to advert to Clauses Three (b) (1) and (2), of the "old contract", which relate to the obligations of Holden to the Company with regard to the photoplays to be produced by Paramount or others, his right to produce within one of the yearly periods "outside photoplays" and the requirement as to notice to be given by him to the Company and their right to preempt his services.

In substance they provide: Paramount agrees to give written notice to Holden on the starting date on which and the place where he shall report for work on any of the photoplays at least thirty days prior to the date specified in the written notice. Holden agrees to report in accordance with the written notice on the starting date specified ready to render his services in conjunction with the photoplay. He also agrees to give written notice to the company specifying each date on which he has agreed to begin rendition of services in conjunction with an outside photoplay. Written notice must be given immediately after the date is made known to him and shall specify the approximate length of time required in connection with the outside photoplay, also the title of the photoplay, the name of person, firm or corporation which proposes to employ his services, the name of the person, firm or corporation which proposes to release and distribute the photoplay and the billing and credits to be accorded to him with respect to such outside photoplay. The clause then states:

"Within four (4) days (excluding Saturdays, Sundays and holidays) after the Corporation shall notify the Artist in writing whether or not it is the intention of the corporation to utilize the services of the Artists in connection with a motion picture photoplay hereunder during the period of the Artist's proposed engagement in such Outside Photoplay or during any portion thereof. Failure by the Corporation to so notify the Artist shall be deemed advice to the Artist that it is not the intention of the Corporation so to utilize his services. In the event the Corporation shall advise the Artist that it does not desire so to utilize his services, the Artist shall be free to render his services in such proposed Outside Photoplay."

On August 11, 1958, Holden notified Paramount that he intended to produce a motion picture for Mirisch, to be released by United Artists. Under the old contract, Paramount had four days to notify Holden under the preemption clause whether it intended to utilize his services in one of Paramount's pictures. Paramount failed to do so.

## II

### Interlocutory Injunctions

The basic problems involved in this lawsuit are: (1) which of the contracts is in existence, and (2) whether the notice of January 2, 1958, and the subsequent declaration of default are valid either under the old or the new contract.

These are questions which cannot be resolved in a preliminary proceeding of this character. For their determination would determine the entire lawsuit. The question for us to determine on this motion is more limited: Should the Court, in the exercise of its discretion, before trial, issue a temporary injunction pre-

venting Holden, a distinguished motion picture artist, from making one photoplay for another company, he having given due notice under the written contract of April 16, 1951, of his intention to do so and the plaintiff not having, within the period allowed by that contract, preempted his services?

■ As this is a diversity case, the law relating to the contract, its interpretation and the policy it embodied is California state law.[3] As stated by the Supreme Court:

"The essence of diversity jurisdiction is that a federal court enforces State law and State policy."[4] This is especially true in a case of this character because by specific provisions of California law, a contract of this character for the services of an artist is exempt from the general provision of California law which forbids the specific performance of contracts for personal services.[5] The exception is contained in both the Civil Code of California[6] and the California Code of Civil Procedure,[7] and reads:

"other than a contract in writing for the rendition or furnishing of personal service from one to another where the minimum compensation for such service is at the rate of not less than six thousand dollars per annum, and where the promised service is of a special, unique, unusual, extraordinary or intellectual character which gives it peculiar value the loss of which cannot be reasonably or adequately compensated in damages in an action at law."[8]

The Supreme Court of California, soon after the enactment of the statute, stated its scope and the condition which it sought to rectify in this manner:

" 'With the exception of such special, unique, and extraordinary personal services as fall within the purview of the amendments of May 6, 1919 (Stats. 1919, pp. 325, 328), to section 3423 of the Civil Code and section 526 of the Code of Civil Procedure, the general rule is that a contract for *service* will not be specifically enforced, either directly by means of a decree directing the defendant to perform it, or indirectly by an injunction restraining him from violating it. Especially is this the rule where the relation between the parties to the contract is one of mutual confidence and the contract stipulates for acts that require special knowledge, skill, or ability, or the exercise of judgment, discretion, integrity, and like personal qualities.' "[9]

■ It is true that, when a case based on diversity is begun in the federal district court, our own rules of procedure govern. But when we interpret a provision in a contract which, under state law, allows specific performance of contracts for personal services and the use of injunctive process in derogation of old established equity rules, we are in a field where the policy of the State should ap-

3. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

4. Angel v. Bullington, 1947, 330 U.S. 183, 190, 67 S.Ct. 657, 662, 91 L.Ed. 832.

5. California Civil Code, § 3390(1) and (2). This is also the general rule. 81 C.J.S. Specific Performance § 82; 49 Am. Jur., Specific Performance, §§ 134–136. And the Supreme Court of the United States, in a noted case, recognized this as the general rule of equity jurisprudence as enforced in federal courts. Karrick v. Hannaman, 1897, 168 U.S. 328, 336, 18 S.Ct. 135, 138, 42 L.Ed. 484:

"In the somewhat analogous case of a contract of hiring and service, it is well settled that a court of equity cannot compel the performance of the service, although it may in some cases enforce a negative stipulation not to serve any third person within the time agreed."

6. California Civil Code, § 3423.

7. California Code of Civil Procedure, § 526 (5).

8. California Code of Civil Procedure, § 526(5).

9. Poultry Producers of Southern California v. Barlow, 1922, 189 Cal. 278, 288, 208 P. 93, 97.

ply.[10] At times, this may make a difference in the relief awarded. However, the policy of the State of California and that of the federal courts as to injunctions is, *generally,* identical. California law specifically provides that an injunction *may be* granted, when it appears by the complaint or affidavits that the plaintiff (1) "is entitled to relief demanded",[11] (2) that the commission or continuance of some act during litigation would produce "great or irreparable injury",[12] or (3) "when pecuniary compensation would not afford adequate relief".[13]

This, in the main, accords with the federal norm.[14] As to interlocutory injunctions the rule declared both by California and federal cases is that the power is discretionary and should not be exercised except where it is clear that the question presented by the litigant who seeks the injunction is free from doubt.

A few references to cases both state and federal will indicate the general accord between courts on this subject.

We begin by referring to a leading California case in which the rule is stated in this manner:

> " 'To issue an injunction is the exercise of a delicate power, requiring great caution and sound discretion and rarely, if ever, should be exercised in a doubtful case. "The right must be clear, the injury impending and threatened, so as to be averted only by the protecting pre-

ventive process of injunction." St. Louis St. Flushing Machine Co. v. Sanitary St. Flushing Machine Co., 8 Cir., 161 F. 725 (88 C.C.A. 585)' " [15]

It is very significant that the Supreme Court of California, in announcing this decision, made reference to a federal case decided by the Court of Appeals for the Fifth Circuit which clearly illustrates what is meant by a doubtful case. In that case, it was sought to compel specific performance of an oral contract to assign a patent. In reversing the Order of the trial court granting a preliminary injunction, the Court said:

> "For another reason, also, the preliminary injunction ought not to have been granted. *It is a fundamental principle that injunctions ought not to issue unless the right alleged to be invaded or threatened is clear. * * * The affidavits in support of and against the motion for injunction leave the existence of the verbal license relied on by complainant in grave doubt and uncertainty, too doubtful and uncertain, at least, to warrant interference with the status quo until the right can be deliberately ascertained and declared at final hearing."* [16] (Emphasis added.)

The Court, in its opinion, referred to an old decision of the Supreme Court in which the principle was declared in a

---

10. Guaranty Trust Co. of New York v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079; Bernhardt v. Polygraphic Co., 1956, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199.
 "The propriety of the issuance of a preliminary injunction, of course, is to be determined by the rules and decisions of federal courts." General Electric Co. v. American Wholesale Co., 7 Cir., 1956, 235 F.2d 606, 608.

11. California Code of Civil Procedure, § 526(1).

12. California Code of Civil Procedure, § 526(2).

13. California Code of Civil Procedure, § 526(4). Additional situations in which

injunctions may or may not issue, spelled out in this section, are omitted, as they have no particular bearing on the principles of law to be discussed in this opinion.

14. Rule 65, Federal Rules of Civil Procedure; Truly v. Wanzer, 1847, 5 How. 141, 142–143, 12 L.Ed. 88; Parker v. Winnipiseogee Lake Cotton & Woolen Co., 1862, 2 Black 545, 551, 17 L.Ed. 333.

15. Willis v. Lauridson, 1911, 161 Cal. 106, 117, 118 P. 530, 535; and see, McPheeters v. McMahon, 1933, 131 Cal.App. 418, 425, 21 P.2d 606.

16. St. Louis Street Flushing Machine Co. v. Sanitary Street Flushing Machine Co., 8 Cir., 1908, 161 F. 725, 728.

form, which, although not original with the Court, has become classic:

"'There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing an injunction. It is the strong arm of equity, that never ought to be extended, unless to cases of great injury, where courts of law cannot afford an adequate and commensurate remedy in damages. The right must be clear, the injury impending, and threatened so as to be averted only by the protecting preventive process of injunction.' Baldw. 218" [17]

In a later case, Mr. Justice Brewer stated the principle in this succinct way:

"It is familiar law that injunction will not issue to enforce a right that is doubtful, or to restrain an act the injurious consequences of which are merely trifling." [18]

And even where the question is not doubtful, it is the duty of the Court to balance the conveniences of the parties:

"The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff. Compare Scripps-Howard Radio v. Federal Communications Comm'n, 316 U.S. 4, 10, 62 S.Ct. 875, 86 L.Ed. 1229 and cases cited. *Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, in the exercise of which the court balances the conveniences of the parties and possible injuries*

*to them according as they may be affected by the granting or withholding of the injunction.* Meccano, Ltd. v. John Wanamaker, 253 U.S. 136, 141, 40 S.Ct. 463, 465, 64 L.Ed. 822." [19] (Emphasis added)

The Court of Appeals for the Second Circuit has summed up the doctrine of balancing of conveniences succinctly:

"The judge must consider whether irreparable harm is likely to result to plaintiff if, *pendente lite* (i. e., 'immediately') the injunction is denied, and against this harm he must balance the harm to defendant likely to result if the relief is granted." [20]

(Emphasis theirs.)

Another principle observed strictly is that the Court must determine whether the final judgment will be of a character that can compensate for any intervening damage:

"Upon application for an interlocutory injunction, the relative adequacy of other remedies depends mainly upon whether the final judgment ultimately available in those remedies will satisfactorily repair or compensate for the injury which the plaintiff will probably suffer in the meantime if interlocutory injunctive relief is denied." [21]

### III

*Résumé of Principles*

Certain principles are deducible from the discussion which precedes, both under federal and state law.

Generally, injunctions, whether final or interlocutory, will not issue unless irreparable injury will flow from the act or threatened act, which damages

17. Truly v. Wanzer, supra, 5 How. at pages 142–143, Note 14.

18. Consolidated Canal Co. v. Mesa Canal Co., 1900, 177 U.S. 296, 302, 20 S.Ct. 628, 630, 44 L.Ed. 777.

19. Yakus v. United States, 1944, 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834.

20. Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738, 743.

21. Restatement, Torts, § 938, Comment (d).

will not compensate. An injunction pending suit should not issue where to do so will call for a decision of the fact ultimately involved in the law suit. Neither the amended nor supplemental complaint in this case seeks damages. So the granting of injunction to Paramount is a decision on all issues in their favor. If Holden is unable to proceed he loses the profit of one picture and the other defendants lose not only their prospective profits but the possibility of retrieving any loss for expenditures incurred to the present time in the preparation for the making of the picture, and occasioned by the failure of Paramount to exercise its preemption. By contrast, the expenditures allegedly incurred by Paramount are not current or prospective but retrospective. The loss they have incurred in making preparations prior to the notice of January 2, 1958, aside from any contractual provisions, is recoverable, under general legal principles, from Holden, should the final judgment be for Paramount. The contention that the making of another picture might saturate the market does not command assent. Companies other than Paramount have released pictures made by Holden with Paramount's acquiescence. There is no showing that the picture to be made is beneath his talent or below the standard expected of him. And, absent such a showing, it is unbelievable that the making of just one additional picture *will depreciate* the value of Holden as an artist. Indeed, the fact that Paramount did not seek to enforce its rights here asserted for months after the default, that, even now, it is only willing to reinstate Holden if he makes his "trip of penance to Canossa", under conditions which have not yet been spelled out, and there has been no demand for his return to work since January 2, 1958, would indicate that Paramount is more interested in preventing the making by Holden of one picture by others than in securing his services for themselves.

If a contract for personal services is not enforceable, except by reason of a special statute in derogation of common equity rules, the statute should be interpreted strictly. So, even those courts which enforce contracts for personal services will not compel *acting* or activities of similar character.[22] So here, if the contention of Paramount is correct, and they have an oral contract only, they could not have the benefit of the injunction under the California Code because both sections specifically speak of a *"contract in writing"*.[23] And we know of no principle of estoppel which would change an oral contract into a written one, even if equitable considerations should call for the enforcement of such contract. The cases which enforce an oral promise to make a written contract do so on the ground of induced change of position, unjust enrichment, fraud or other equitable considerations.[24]

Another principle which is applied and which is stressed in the cases discussed is that an interlocutory injunction should not issue *in doubtful cases*. Here the very purpose of the action is to determine whether a contract is in existence or has been superseded by a subsequent contract, an alleged memorial of which the defendant has repudiated.

The very object of the declaratory judgment is to seek a court's determination of the rights of the parties when a controversy exists, even before the acts of the parties result in damage.[25]

22. See illustrations in 81 C.J.S. Specific Performance § 82, p. 592, and cases cited in Notes 71–78 to the text.

23. California Civil Code, § 3423; California Code of Civil Procedure § 526.

24. Halsey v. Robinson, 1942, 19 Cal.2d 476, 481–482, 122 P.2d 11; Columbia Pictures Corp. v. DeToth, 1945, 26 Cal. 2d 753, 759–760, 161 P.2d 217, 162 A.L.R. 747; Wilk v. Vencill, 1947, 30 Cal.2d 104, 108, 180 P.2d 351.

25. 28 U.S.C.A. §§ 2201, 2202; Rule 57, Federal Rules of Civil Procedure; Aetna Life Insurance Co. of Hartford, Conn. v. Haworth, 1937, 300 U.S. 227, 240–241,

### Summary and Conclusion

In what precedes we have indicated the reasons why no interlocutory injunction should issue at this state of the litigation. However, certain other considerations should be adverted to as a guide to counsel in preparing findings as required by the federal rules.[26]

■■■■ The notice to report for work dated November 27, 1957, which is printed in the margin,[27] was given, *not under the old contract but under the new contract*. As it is approved as to form by counsel for Paramount any contention that an error was made loses its appeal.

The letter shows distinctly that Paramount was claiming,—as it does even now,—that the old contract had been terminated and that a new contract was in effect. The attempt is made to escape the consequence of this notice by reference to the subsequent letter of February 21, 1938, which is also reproduced in the margin.[28] This lacks substance, for this notice is tied to the preceding notice by its very wording. The first paragraph refers to the *previous notice* and the reference to "under our contract of employment with you" cannot be turned into a designation of the new contract. When a party to a contract deliberately refers

---

57 S.Ct. 461, 81 L.Ed. 617. As stated in Scott-Burr Stores Corp. v. Wilcox, 5 Cir., 1952, 194 F.2d 989, 990:

"While the date of the beginning of the claimed extended term was in the future, *the assertion of right to its enjoyment was presently being made.* The facts of the case disclosed an actual controversy, and the settlement of such controversies *'before they ripen into violations of law or some breach of contractual duty'* is a fundamental purpose of the Declaratory Judgment Act, 28 U.S.C.A. § 2201." (Emphasis added.)

See also, the writer's article on Declaratory Judgment, 1940, 1 F.R.D. at pages 295, 297–298; Universal Sales Corp. v. California Press Mfg. Co., 1942, 20 Cal.2d 751, 774, 128 P.2d 665; Columbia Pictures v. DeToth, supra, 26 Cal. 2d at pages 760–761, 161 P.2d at pages 220–221, note 4.

26. Rule 52(a), Federal Rules of Civil Procedure.

27. "November 27, 1957
"Mr. William Holden
c/o Famous Artists Corporation
9441 Wilshire Boulevard
Beverly Hills, California

"Dear Mr. Holden:

"Please take notice that we hereby designate January 2, 1958, as the date on which you shall be required to report to our studios in Hollywood, California, ready to render your services in connection with the first of the six (6) motion picture photoplays referred to in Subdivision (a) of Paragraph First of the employment agreement between you and the undersigned corporation dated as of October 22, 1956.
"Very truly yours,
Paramount Pictures
Corporation
By s/ Jacob H. Karp
Assistant Secretary
Form O.K. s/ Frank"

28. "February 21, 1958
"Mr. William Holden
c/o Famous Artists Corporation
9441 Wilshire Boulevard
Beverly Hills, California

"Dear Mr. Holden:

"We recently gave you notice of a starting date of January 2, 1958, upon which you were required to report to our studio ready to render your services in a motion picture photoplay under our employment contract with you.

"However, you have now expressed your unwillingness to appear in the scheduled picture; and you have not reported to our studio as required by our notice.

"You are accordingly in default in your obligations to us under our contract.

"Please take notice that we have accordingly elected to refrain from paying you any salary under our employment agreement during the period of nonperformance in accordance with the terms of our contract.

"Please take further notice that we hereby reserve the right to take such other and further action as we may deem appropriate by reason of your said nonperformance.
"Very truly yours,
Paramount Pictures
Corporation
By s/ Jacob H. Karp
Assistant Secretary"

to a notice as given under a specific contract, it cannot be heard to say in a proceeding to secure an interlocutory injunction that the notice was a general one under *whatever contract may exist.* This is especially true *when the object of the notice is to place the other party to the contract in default* and the contract is one which is required to be written. To say the least, an interpretation that would, in effect, reform the notice should await a final decision which, alone, after a full hearing, would and could determine whether there is a default, whether it is remediable, what rights exist, if, as Paramount contends, the old contract has been terminated and what the terms of the new contract are which Holden denies having assented to.

 Equity will intervene by injunctive process

" * * * where the injury is of such a nature that it cannot be adequately compensated by damages at law, or is such, as from its continuance or permanent mischief, must occasion a constantly recurring grievance, which cannot be prevented otherwise than by injunction." [29]

And our Court of Appeals in a leading case has stated that in the matter of injunctions

"it is proper to consider all of the facts and circumstances of the case in order to determine the equities, including comparative damages, where, as in the present case, it is sought to enjoin a lawful business, and to withhold the writ where it appears that it will necessarily operate contrary to the real justice of the case." [30]

And whether injunction is granted or refused, whether irreparable injury would follow refusal depends not so much

on general principles as upon the equities in each particular case. [31]

On the balancing of equities, it is clear that the only harm which could result to the plaintiff would be a delay of thirteen weeks, the period required for Holden to complete the picture which he desires to make for Mirisch and United Artists. In view of the fact that the defendants did not, between February 21, 1958 and June 26, 1958, seek any redress against Holden, it is doubtful if the injury they will suffer is of a character which is not compensable in damages.

There is a further consideration: Paramount, after receiving the notice of August 11, 1957, indicating Holden's intention to make the picture, could have, within four days, preempted his services. It failed to do so, convinced that its previous notice of default was sufficient. It is at least questionable whether a notice given *under a contract specifically designated by date and content* can be used to defend an alleged default declared under another contract predating it by several years.

 Paramount may be right in its contention. So may Holden. By denying an injunction, Paramount is merely deprived of his services for the period required for the production of one picture. By granting it, the undertaking between Holden, Mirisch and United Artists is at an end and they cannot recoup their damages in any manner, even if, ultimately, they should be proved right by a judgment of this court. Paramount, by simply exercising its preemption right, could have remedied the entire situation. Such a preemption would not affect its contention as to the existence or non-existence of the new contract. For it is still arguable that it had the right to resort to the preemption clause, despite its contention that Holden was in

29. Parker v. Winnipiseogee Lake Cotton & Woolen Co., 1862, 2 Black, 545, 551, 17 L.Ed. 333.

30. Bliss v. Washoe Copper Co., 9 Cir., 1911, 186 F. 789, 827.

31. 43 C.J.S. Injunctions § 12; see, Anderson v. Souza, 1952, 38 Cal.2d 825, 834, 845, 243 P.2d 497.

default under the new contract. Its present request for a declaration in the alternative would not have been impaired by such preemption. For it would have been consistent with it. Holden had a right to assume that their failure to act, between February 21, 1958 and June 26, 1958, and the nature of the relief they asked under the original complaint, that, *if they were primarily interested in securing his services,* they would have exercised the right of preemption and left to the courts the determination of the controversy as to which contract was in effect, which was the sole object of the original complaint. When they did not, he was free to act as he chose under his own interpretation as to the status of the relationship between them. The fact, much stressed at the argument and in the memoranda filed by Paramount, that Holden concedes that the Contract of 1951 is still in effect, does not call for the granting of an interlocutory injunction. The fact remains that there is a controversy between the plaintiff and Holden as to which contract is in effect and that the notice of default is based upon the alleged existence of a new contract which Holden has repudiated. These questions, as already stated, can be resolved only after a trial of the case. To grant to Paramount now all the relief they ask in the amended complaint would be to determine in their favor questions which are, to say the least, doubtful. And it is fundamental equitable doctrine that injunctions, especially interlocutory injunctions, should be granted only

"*in clear cases reasonably free from doubt.*" [32] (Emphasis added.)

32. The quotation is from 28 Am.Jur., Injunctions, § 24. The paragraph from which it is taken sums up succinctly the principles here discussed and the rulings in the cases cited in Notes 15 to 19. It is reproduced in its entirety:
"The extraordinary character of the injunctive remedy and the danger that its use in improper cases may result in serious loss or inconvenience to an innocent party require that the power to issue it should not be lightly indulged in, but should be exercised sparingly and

The Motion for Interlocutory Injunction will be denied. Findings and order to be prepared by counsel for the defendants under Rule 52(a) of the Federal Rules of Civil Procedure and Local Rule 7, West's Ann.Cal.Code.

cautiously, only after thoughtful deliberation, and with a full conviction on the part of the court of its urgent necessity. In other words, the relief should be awarded *only in clear cases reasonably free from doubt,* and, when necessary to prevent great irreparable injury. * * * Likewise, a temporary injunction will be denied in all cases where *the right is doubtful* and particularly where to grant it would interfere with an industry promotive or public utility." (Emphasis added.)