**BOISE CASCADE INTERNATIONAL, INCORPORATED, a Delaware corporation, Plaintiff,**

**v.**

**NORTHERN MINNESOTA PULPWOOD PRODUCERS ASSOCIATION, an unincorporated association, and Emery Carlson, Norman Warpula, and James Parnham, individually and as officers of said association, Defendants.**

No. 5–68 Civ. 52.

United States District Court
D. Minnesota,
Fifth Division.

Dec. 28, 1968.

---

Dorsey, Marquart, Windhorst, West & Halladay, by Curtis L. Roy and John C. Zwakman, Minneapolis, Minn., for plaintiff.

Hammer, Weyl, Halverson & Watters, by D. L. Bye, Duluth, Minn., for defendants.

NEVILLE, District Judge.

Plaintiff, a paper mill and manufacturer of insulite wallboard, is engaged in interstate commerce with a mill and plant at International Falls, Minnesota on the Canadian border. It brings this suit to enjoin defendants, an "ad hoc" unincorporated association and three individuals, said to be officers thereof, (1) from what it claims to be a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the form of a boycott and (2) from inducing other persons to breach their existing contracts with plaintiff. The complaint also seeks treble damages. Plaintiff followed the filing of the complaint with moving papers seeking a preliminary injunction. No answer has yet been filed and the time therefor has not yet expired; nor is the court advised whether either party demands a jury trial on the merits.

Prior to the hearing and the taking of testimony on the question of a preliminary injunction, the court invited the attention of both counsel to Rule 65(a) (2) of the Federal Rules of Civil Procedure relative to consolidating the trial of the action on the merits with the application for preliminary injunction. Neither counsel expressed themselves to this end and no stipulaion was made concerning such a procedure. The court is aware of the last sentence of Subd. (a) (2) that it shall be construed "as to save the parties any rights they may have to trial by jury." Consequently, since this action involves not only a request for injunctive relief but a prayer for treble damages, it is clear either party is entitled to demand a jury trial. This would seem to prevent the court from making any finding on the merits of the request for injunctive relief since under traditional principles of *res adjudicata* such would deprive either party or both parties of the right to a jury trial. Even should plaintiff waive a jury trial, defendants would seem entitled to have a jury pass on the question of whether they are in violation of law so as to render them liable. None of the parties should be bound as though there had been a trial on the merits at the preliminary hearing had before this court.

It should thus be emphasized that this is a suit for preliminary relief under 15 U.S.C. § 26 and that the court is not passing upon the merits of the controversy in question. Any permanent injunctive relief, if in fact plaintiff succeeds in its case on the merits, can only be granted after a full hearing and specific findings by the trier of fact whether this be by the jury or by the court. See, Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); United States v. Munsingwear, Inc., 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950); and Florists' Nationwide Telephone Delivery Network, etc. v. Florists' Telegraph Delivery Ass'n, 371 F.2d 263, 270–271 (7th Cir.), cert. denied, 387 U.S. 909, 87 S.Ct. 1686, 18 L.Ed.2d 627 (1967). Whether

at a full trial on the merits, the evidence heretofore adduced need not be repeated will await a ruling by the court at that time. A general jury term of this court commences at Duluth, Minnesota on January 6, 1969, and this case will be advanced and will stand for trial on the merits on that date or as soon after January 6, 1969 as the case can be reached.

The facts of this case are not seriously in dispute. Plaintiff uses as its raw material a forest product known as pulpwood in its manufacturing processes. It acquires this for the most part locally, that is to say within a radius of 50 miles or thereabouts. Trees employed for this purpose are younger trees—largely second growth—said to be 40 years of age and up. This part of northern Minnesota is a sparsely populated wooded or forest area. Seventy-five per cent of the land in Koochiching County of which International Falls is the county seat was testified to be either state or county owned. Permits to cut timber therefrom must be obtained from proper authorities. In order to obtain pulpwood, plaintiff contracts with what are called loggers, who cut timber growing for the most part if not entirely on land owned or controlled by plaintiff. These loggers and generally the deliverers of wood chips are not involved in this dispute. Plaintiff also traditionally contracts each year with approximately 400 "pulpwood producers" or as plaintiff's witnesses characterized them "open market operators". As of date of hearing herein, plaintiff had existing contracts with some 250 such operators. These operators and their recent activities are the subject matter of this action.

Generally the operators enter into individual contracts with plaintiff for the winter season commencing on or about November 1st of each year. The contracts obligate them to deliver a specified quantity of pulpwood in particular lengths for a price for each species or set amount of dollars per cord, deliveries to be completed on or before March 15th of the following year, (or apparently occasionally at an earlier date). There are also summer contracts made with the operators but such are not presently involved in the request for preliminary injunction. The dates for the so-called winter contracts are determined to accommodate weather conditons. Operators cannot easily get into the woods and across the swamps with their equipment to cut timber until the ground is frozen, nor operate successfully at least for a period after the spring "break up".

The open market operators meet the classic definition of independent contractors. They provide their own saws, loaders, trucks and trailers and other equipment. Plaintiff does not furnish nor finance such. They cut and deliver pulpwood when and as they can and please so long as they have completed their deliveries by the deadline date of mid-March (occasionally earlier). They may, and many do, hire others to assist them. They receive no wages, but merely a price for their product and apparently at the desire of both the plaintiff Company and operators are not considered employees. There was testimony that plaintiff owns and controls some 375,000 acres of land near International Falls, and is re-planting trees on some of its "plantations". For the most part if not entirely, however, the operators cut trees that were not planted by themselves but are natural growth and are 40 years or more of age. "Cropping" trees undoubtedly is a forward-looking plan, but is as yet obviously in its infancy.

Apparently in 1967, and continuing into the winter 1968–69 season, plaintiff made some changes in the manner of paying for its wood products, basing such on total weight (maintaining a differing winter and summer weight) rather than paying on volume basis, i. e., by the cord. This appears to have caused some unrest among a substantial number of the operators. This and perhaps other grievances resulted in several meetings of the operators and other interested persons and ultimately in a request by the operators to meet jointly with some of plaintiff's officials to discuss alleged dif-

ferences. This request in any sort of a formal way was received after November 25, 1968, and plaintiff refused to discuss any grievances until what it termed the boycott was lifted, and the operators refused so to do until plaintiff would grant an audience to hear and discuss grievances. A deadlock has resulted. The court hopes that following this order discussions will ensue between the parties.

Principally the operators wish a raise in the prices paid for their pulpwood. They have never been organized on any sort of group basis before nor presented any concerted or uniform demands to plaintiff. They have historically made individual contracts year after year at varying times and (with minor exceptions due to distances involved in transportation) the same price has been rather uniformly paid by the plaintiff company as to all operators.

The operators have been determined not to be a labor organization, at least within the meaning of the National Labor Relations Act. An attempt to affiliate with the Teamsters Union (Local 615 Virginia, Minnesota) was thwarted by a letter from the Regional Director of the National Labor Relations Board dated October 29, 1968, which reads in part as follows:

> "As a result of the investigation, it appears that the unit of employees for which the Petitioner seeks to act as bargaining agent is inappropriate for collective bargaining purposes.[1] Con-
>
> 1. Independent Contractor.
>
> sequently, further proceedings are not warranted and I am therefore dismissing the Petition in this matter."

About mid-November 1968 a group of operators met in a town near International Falls and concluded to attempt to take what it considered remedial measures. Witness Emery Carlson, a defendant, claims there was no formal organization of any association, but that because he was somewhat more vocal than others he was asked to assume the podium, and that by so doing plaintiff has designated him as President. The organization never formally elected any officers, and has adopted no constitution or by-laws. Membership cards were issued, however, to some number of persons who paid $3.00 dues to one of their number assuming the duties as treasurer. Defendant Parnham apparently acted as *ad hoc* secretary and so has been designated by plaintiff in the pleadings as an officer of the association. The name Northern Minnesota Pulpwood Producers Association was used and adopted.

Commencing on November 25, 1968 a group of men, mostly if not all operators estimated by various witnesses and at various times as between 15 and 40, gathered at the plaintiff's plant. They appear to have been careful not to trespass on plant property and it is clear they exercised no violence. They stopped, or attempted to stop trucks making delivery of pulpwood and wood chips to the plaintiff's plant, talked to the drivers, explained grievances, stated they were seeking a price of an additional $1.00 per cord for their wood, and dissuaded some substantial number of operators (and wood chip deliverers) from making delivery to the plant. Defendants Emery Carlson and Norman Warpula were prominent among the group and defendant James Farnham was identified as being present on one or more occasions or engaged in some of the activities. There was no testimony that the defendants ever actually blocked access by truckers to the plaintiff's weighing scale (the first stop for truckers making deliveries to plaintiff's plant) but a number of parked cars did impede to some extent free and usual access to the scale. There was no evidence that any driver actually was forced away from the plant, and even as at date of the hearing of this matter, some witnesses testified they were still making deliveries. A number of untoward incidents occurred at a distance from plaintiff's plant or mill affecting damage to the equipment of some operators who insisted on making deliveries but no reliable evidence was presented connecting

such with the defendants. The court thus struck such evidence from the record, according plaintiff the benefit of Rule 43(c) of the Federal Rules of Civil Procedure relating to an offer of proof.

By way of comparison, it was testified and records were produced showing that for December 1967 plaintiff's plant received between 850 and 1800 cords of pulpwood a day from operators and that for the month of November 1968, up to November 25th, the plant had received an average approximating 1500 cords of pulpwood per day from operators.

Upon the advent of defendants' activities on November 25, 1968, receipts of pulpwood from operators virtually ceased. Three Hundred Seventy Five cords arrived November 25, but there were none for November 26 thru December 1st, thereafter increasing in irregular amounts to 408 cords on December 9th, the day this suit was filed. The activities of the group of operators obviously was and is being quite effective. There is no question or doubt in the court's mind, whether or not the Northern Minnesota Pulpwood Association be deemed a formal association but that a number of the operators have acted in concert and with a common joint purpose and have very successfully diminished plaintiff's pulpwood deliveries.

Plaintiff claims irreparable damage and injury and the court permitted one of plaintiff's witnesses, general manager of the procurement or woodlands division, to testify over objection that an estimate of damage to date is $100,000. No detail was given for this figure, the bulk of which apparently represents increased prices paid to secure pulpwood by rail from other sources. The plant has not closed down to date and is still running 24 hours a day, 7 days a week, and has on hand 4 to 5 days of pulpwood supply. This reserve has been dwindling however. Much is made of the fact that the plant is International Falls' principal industry and employs some 2100 people with an annual payroll of $15,000,000 who would be out of work were the plant forced to close. As to what the court must find in order to grant a preliminary injunction, a quote from McKesson and Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743 (E.D.Pa.1964) is particularly apropos:

"Preliminary, the request for a preliminary injunction, at the very outset of the litigation, is addressed to the sound discretion of the Court. Joseph Bancroft and Sons Co. v. Shelley Knitting Mills, Inc., 268 F.2d 569 (3rd Cir. 1959). The plaintiff must show: (1) that the conduct to be enjoined is in furtherance of the alleged violations of the Sherman Act; (2) that there is a substantial likelihood the allegations of the complaint will be sustained at the trial of the cause; (3) that irreparable harm to the plaintiff will result if the injunction pendente lite is denied; (4) and that there is no conduct by McKesson which would bar the granting of equitable relief." 235 F.Supp. at 746.

Further, these four rather specific burdens are concomitant with other well-established principles of equity, e.g., preservation of the status quo, public interest and the defense of unclean hands. Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292 (3rd Cir. 1940); B & W Gas, Inc. v. General Gas Corp., 247 F. Supp. 339 (N.D.Ga.1965); McKesson and Robbins, Inc. v. Charles Pfizer & Co., 235 F.Supp. 743 (E.D.Pa.1964); and Fein v. Security Banknote Co., 157 F.Supp. 146 (S.D.N.Y.1957).

At the outset it is clear that the court cannot by any sort of a mandatory injunction compel specific performance of the approximately 250 extant open market operators' contracts. From time immemorial, courts of equity have recognized the impossibility of enforcing a contract where personal services are involved, and have refused so to do. Certainly it is not feasible nor appropriate that the United States Marshal should go into the woods, stand over the operators and attempt to compel them to cut wood and deliver the same.

■ Insofar as the relief sought by plaintiff is an order for specific performance of contracts to supply wood or compelling defendants and other pulpwood producers to cut, load and deliver their product to its mill, such are personal service contracts and the court should not, either directly or indirectly, by means of an injunction, compel the affirmative performance of any such contracts. Rutland Marble Co. v. Ripley, 10 Wall. 339, 19 L.Ed. 955 (U.S.1870); Bennett v. Fox Film Corp., 149 Minn. 88, 182 N.W. 905 (1921); Paramount Pictures Corp. v. Holden, 166 F.Supp. 684 (D.C.Cal.); King Features Syndicate, etc. v. Courrier, 241 Iowa 870, 43 N.W.2d 718, 41 A.L.R.2d 467 (1950); 28 Am.Jur., "Injunctions" § 108; 49 Am. Jur., "Specific Performance" § 134.

■ Also it is well established that any individual operator acting alone and not in concert with others is, and has been free, to sell his product or his labor to whom he will at such price as he cares to demand, or to withhold the same from the market as he pleases. He may ask any price he chooses and (assuming he is not breaching an existing contract) may cut his timber or refuse to do so. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

The court is convinced that defendants' conduct may well be found to be in furtherance of an alleged violation of the Sherman Act and that plaintiff has shown a reasonable probability and substantial likelihood of success at a trial on the merits. Defendants placed much emphasis on the fact that if any group existed here it was an *ad hoc* group of individuals expressing common grievances against plaintiff and not a formal "association" conducting a group boycott. The statute however, Section 1 of the Sherman Act, requires no formal association but only a "combination or conspiracy," and this has always been interpreted to countenance some type of agreement among the parties to the conspiracy or combination, whether formal or informal. As stated in Esco Corp. v.

United States, 340 F.2d 1000, 1008 (9th Cir. 1965):

"It is not necessary to find an express agreement, either oral or written, in order to find a conspiracy, but it is sufficient that a concert of action be contemplated and that defendants conform to the arrangement. [Citing cases] Mutual consent need not be bottomed on express agreement, for any conformance to an agreed or contemplated pattern of conduct will warrant an inference of conspiracy."

See, Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954); United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L. Ed. 1461 (1942); Sugar Institute, Inc. v. United States, 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936); Maple Flooring Mfrs' Ass'n v. United States, 268 U. S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); and United States v. American Linseed Oil Co., 262 U.S. 371, 43 S.Ct. 607, 67 L.Ed. 1035 (1923). In the case at bar, the evidence is uncontroverted that there was a combination of pulpwood producers outside the Boise Cascade paper mill on a daily basis starting on November 25, 1968. The named individual defendants were seen attending this group and giving instructions on several occasions. It is clear that many pulpwood producers have associated and acted together, albeit informally, under the name of the Northern Minnesota Pulpwood Producers Association.

■ The court is also convinced, at least for the purposes of passing on plaintiff's request for preliminary relief, that this "association" and the individuals named as defendants have engaged in a concerted group boycott the purposes of which have been to attempt to control the price of pulpwood which they sell to plaintiff. It is well settled that such group boycotts are illegal per se and unreasonable restraints of trade as a matter of public policy. United States v. General Motors Corp., 384 U.S. 127,

86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); Radiant Burners, Inc. v. People's Gas, Light & Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); and Fashion Originators' Guild of America v. Federal Trade Comm., 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

The difficulty arises when two or more operators begin to act in concert, that is in jointly agreeing to withhold their products from market pending the ascertainment of a particular price. This is the evil at which the antitrust laws are aimed. If three or a dozen or fifty manufacturers of refrigerators, automobiles, steel, or any other products for instance, agree not to sell below a certain price and to withhold products from the market until that price is obtained, competition is destroyed, the incentive to make better products more cheaply is gone, and the evils of monopoly or oligopoly exist and tend to be created. The attempt in the present lawsuit is to bring the open market operators or pulp producers within the ambit of this principle and reasoning.

It is clear to the court that the conduct in which the operators have engaged since November 25, 1968 or thereabouts is likely to be in contravention of the principles and theories espoused by Section 1 of the Sherman Act. The operators are attempting to withhold product to obtain a certain price ($1.00 more per cord of wood) and to accomplish this are attempting to induce other such operators to adopt a similar course of conduct. Such conduct clearly would be and has been condemned by sellers of books, milk, structural steel, electrical equipment, motion pictures and many, many other products. The antitrust laws are designed to condemn just such conduct.

█ It is true that the operators here are not United States Steel, General Motors or General Electric, but are back-woodsmen who by their own industry and sweat cut timber in the dead of winter and haul it to and sell it to their most immediate and perhaps in reality their only available market from a transportation standpoint, i. e., the plaintiff in this case. While they suffer a disparity of bargaining position, it seems to the court that under the teachings of Los Angeles Meat and Provision Drivers Union, Local 626 v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L. Ed.2d 150 (1962) (grease peddlers) and Columbia River Packers Ass'n, Inc. v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942) (fishermen) this court is bound and must hold that the identity or economic circumstances of the persons apparently violating Section 1 of the Sherman Act by concentrated price fixing activities is not material and that the conduct of the operators here in all likelihood may well be found to be in contravention of the letter, principles and spirit of the Sherman Act.

█ This then brings the court to the question as to whether the open market operators can be found to be exempt from the antitrust laws. There are two possible bottoms for this claim:

(1) The Capper Volstead Act, 7 U.S. C. § 291 which reads in pertinent part as follows:

"Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes * *."

It is difficult for the court to find that the operators are "farmers" or "planters" or "ranchmen" and clearly they are not "dairymen" or "nut or fruit growers".

The term "agricultural products" is not defined within the Capper Volstead Act. The Co-operative Marketing Act, 7 U.S.C. § 451, defines "agricultural products" to include only "the edible products of forestry." On the other hand, the Minnesota Cooperative Marketing Act, Minn.Stat. § 308.52, includes all "forestry" in its definition of "agricultural products." The court is willing to assume, *arguendo*, that trees, or at least the cutting and harvesting thereof, is within the term "agricultural products." Such does not however answer the question because even producers of agricultural products and their agricultural organizations are subject to the antitrust laws when they step outside the scope and purpose of these limited exemptions. See, Case-Swayne Co. v. Sunkist Growers, Inc., 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621 (1967); and Maryland & Virginia Milk Producers Ass'n v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L. Ed.2d 880 (1960). Therefore, if for no other reason, it would seem the Capper Volstead Act at a trial on the merits may well be found not to accord the operators an exemption from the operation of the antitrust laws.

(2) Apart from the Capper Volstead Act, the antitrust law itself, specifically 15 U.S.C. § 17, creates certain exemptions. These are perhaps broader than those in the Capper Volstead Act. There is no doubt but what many, many activities of labor unions themselves might well be contrary to antitrust principles *if* Congress had not deemed that human labor is not a commodity in interstate commerce. 15 U.S.C. § 17 reads in part:

> "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, *agricultural*, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws." (Emphasis added)

Labor and agricultural organizations thus may continue "for the purposes of mutual help" and may not be restrained "from lawfully carrying out the legitimate objects thereof". The question which may be before the trier of fact then is whether the present loosely organized Northern Minnesota Pulpwood Association can be said to be an agricultural organization. If so, then its activities are exempt from the umbrella of antitrust restrictions. From the standpoint of the operators it is easy to understand that they may look at their brothers employed in plaintiff's mill or plant and observe that they have the right to organize and to strike, even though irreparable harm ensues to the employer and perhaps to many persons not connected directly or involved with the strike. It is understandable that the operators deem themselves a part of plaintiff's labor force, not running a machine in the factory to be sure, but laboring in the woods to cut and produce the pulpwood which produces the raw material that keeps the factory running. Does the happenstance that historically their labor is rendered in the form of independent contractors vary this? Is form more important than substance? Can it not fairly be said that the Congress, had the issue been specifically pointed up, would have considered such a group as the operators an agricultural association and within the purview of the exemption?

The two cases of *Los Angeles Meat and Provision Drivers, etc.* and *Columbia River Packers Ass'n* above cited are distinguishable. Neither can be said to have an aura of agriculture, as does the case at hand; nor in either opinion was any reference made to the above exemption section of the Sherman Act. *Los Angeles Meat and Provision Drivers,*

*etc.* dealt with "grease peddlers", *i. e.,* those who bought up used kitchen grease from hotel and restaurant kitchens and resold the same, largely for export. The *Columbia River* case comprised fishermen selling to a cannery, and the court struck down an organized attempt to withhold catch from the market. The court believes the trier of fact at a trial on the merits may well find that the operators have a right to be in an association and to speak and act collectively. It would appear that the association cannot represent anyone but its own *bona fide* members; it cannot purport to represent those who are not its members as can a labor union once a successful National Labor Relations Board election has been held. It would seem it can, however, speak for and represent its members; that when a new round of contracts is to be made with plaintiff, the members of the association might act collectively and only for their own members.

A determination however, if it is so made at a trial on the merits, that the Northern Minnesota Pulpwood Producers Association is an agricultural organization exempt from the Sherman Act, does not fully answer the question now before the court in this preliminary injunctive request. The antitrust exemption even for long existing and well established labor unions, for instance, does not permit it to engage in every type of activity, nor to conspire with others to use illegal means to achieve a result. A boycott is such an illegal means. Members of an organization can resist and withhold their own labor, but the use of a boycott by prevailing upon others so to do is condemned by statute and by court decisions as illegal per se.

The defendants here are not merely asserting demands for themselves and the members of their association, but are endeavoring to dissuade others either by persuasion or by what some might interpret as intimidation; this activity must be judged in light of the fact that some 250 operators already have contracts with plaintiff and, according to plaintiff's testimony, normally by this time of year approximately 400 operators would have entered into contracts. While it cannot in a technical sense be said that any operator yet has breached his contract, or been persuaded to by the operators, it is obvious historically that with 400 operators under contract the plaintiff company would have a normal daily flow of 1,000 to 1,500 cords of wood a day and this has been quite successfully and definitely interrupted; this has set back or deferred the normal and usual time schedule for performance by the operators and has been disruptive. The court believes that there is a real danger that if present conditions continue the plant may be forced to close. Certainly such will cause irreparable harm, not only to the parties but to many others not here involved.

Whether or not the court be upheld at a trial on the merits in its determination that the association is an agricultural organization exempt from the antitrust laws, it is clear that the defendants cannot continue their boycott in violation of their existing contracts, cannot assemble at the plant as for "peaceful picketing" to dissuade or interfere with those who wish to deliver products to the plant; nor can defendants persuade or attempt to persuade others not to perform their contracts or to refuse normal business relations with plaintiff. When and if the individual operators wish to renew their contracts, the association may be found at a trial on the merits to be permitted to speak for those who so authorize; but the association cannot speak for others and by the same token cannot dissuade or attempt to dissuade others or even its own members who have existing contracts from having normal business intercourse and relations with plaintiff.

The court is clear that the Norris-LaGuardia Act, 29 U.S.C. § 104, does not apply to the facts of this case so as to prevent preliminary injunctive relief. It would seem that this is not a "labor dispute" in the traditional sense and thus that act has no application. Colum-

bia River Packers Ass'n, Inc. v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750 (1942); Los Angeles Meat and Provision Drivers, etc. v. United States, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962). Rather what is presented in the case at hand is an apparent violation of the Sherman Act by virtue of what appears to be an illegal boycott by what the trier of fact ultimately may well find to be a legal organization.

This memorandum shall be in lieu of and shall be deemed to include the court's findings of facts for purposes of Rule 52 of the Federal Rules of Civil Procedure. A separate injunctive order has been entered.